UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STEPHEN R. HUBERTY,                          Case No. 06-CV-2388 (PJS/RLE)

          Plaintiff,

v.                                                              ORDER

STANDARD INSURANCE COMPANY,

          Defendant.

---

Richard A. Williams, Jr., WILLIAMS & IVERSEN, P.A., for plaintiff.

Terrance J. Wagener and John Harper, III, KRASS MONROE, P.A., for defendant.

Plaintiff Stephen Huberty worked for Analysts International Corporation ("Analysts") doing computer-related work, including project management, for about fifteen years. Through his job at Analysts, Huberty was covered under short-term and long-term disability insurance policies issued by defendant Standard Insurance Company ("Standard"). In March 1999, Huberty had back surgery, and he returned to work part time in June 1999. Standard paid disability benefits to Huberty from March 1999 through September 2000, when Standard decided that Huberty was no longer fully or partially disabled.

Huberty had back surgery again in May 2001. He subsequently went back to work until mid-September 2003, when he filed a second claim for disability benefits. Standard provided benefits for several weeks, but at the end of November 2003, Standard cut off Huberty's benefits a second time.

Huberty brings this suit for benefits under 29 U.S.C. § 1132(a)(1)(b), the section of the Employee Retirement Income Security Act ("ERISA") that authorizes such suits. Huberty

challenges Standard's 2000 and 2003 decisions to discontinue his disability benefits.  Standard and Huberty cross-move for summary judgment.

For the reasons that follow, the Court grants Huberty's motion in part and denies Standard's motion.  The Court orders Standard to pay long-term disability benefits with respect to Huberty's 2000 claim for September 20, 2000 through January 15, 2002; to pay short-term disability benefits with respect to Huberty's 2003 claim for December 1 through December 14, 2003; and to consider Huberty's eligibility for long-term benefits after December 14, 2003.

## I.  BACKGROUND

### A.  *Policy Terms*

#### 1.  Long-Term Disability Policy

Under the long-term disability policy in effect as of September 2000, if an insured such as Huberty becomes "Disabled" under the policy, Standard is obligated to pay benefits after receiving "satisfactory Proof Of Loss."  AR-19.[1]  The policy defines two types of disability: own-occupation disability and partial disability.  *Id.*

Own-occupation disability is defined this way:

> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are *unable to perform with reasonable continuity* the Material Duties of your Own Occupation.

---

[1]The administrative record in this case is Exhibit A to the Bailiff Affidavit [Docket No. 25].  Pages in the administrative record are denoted herein by the prefix "AR-" followed by the page-number portion of a page's Bates number (e.g., page STND283-00752 is here denoted as AR-752).

*Id.* (emphasis added).[2]  The policy does not define "reasonable continuity," but, in context, it appears to mean something like "on a full-time basis."[3]

Partial disability is defined this way:

> [Y]ou are Partially Disabled when you work in your Own Occupation but, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are *unable to earn the Own Occupation Income Level* or more.

*Id.* (emphasis added).  The "Own Occupation Income Level" is defined as eighty percent of an insured's predisability earnings.  AR-22.[4]  Thus, benefits are available under the policy to an

---

[2]"Own occupation" disability is further defined to exclude a mere reduction in earnings resulting from the "disclosure of" a disability.  AR-19.

[3]Under the short-term disability policy, discussed below, an insured is disabled only if he is *both* (1) unable to do the material duties of his own occupation "with reasonable continuity," *and* (2) unable to earn eighty percent of his predisability earnings, whether working in his own job or some other job.  AR-769.  It follows, by necessary implication, that an insured who works part time in his "own occupation" is *not* working in that occupation "with reasonable continuity."

The meaning of "reasonable continuity" in the long-term disability policy is somewhat less clear.  If "own occupation disability" and "partial disability" under the long-term policy are mutually exclusive, then an insured who works part time in his own occupation and qualifies as partially disabled must, by necessary implication, be working "with reasonable continuity" — otherwise he would meet the definition of own-occupation disability.

It seems more likely, however, that under the long-term disability policy, partial disability is a *subset* of own-occupation disability, and that everyone who is partially disabled and working part time also necessarily meets the definition of own-occupation disability.  That is, all insureds who are unable, because of disability, to work full time in their own occupations meet the own-occupation definition of disability, because working less than full time equates to *not* working with reasonable continuity.  And of the group of employees who meet the own-occupation definition of disability, those who can work part time are partially disabled, while those who cannot work at all are totally disabled.

[4]Technically, the "Own Occupation Income Level" is eighty percent of "indexed" predisability earnings.  AR-22.  This detail is unimportant for purposes of this case.

insured who can work in his own occupation but, because of his disability, cannot earn at least eighty percent of his predisability earnings.[5]

An insured's own occupation, and the material duties of that occupation, are defined this way:

> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with the Employer.  Your Own Occupation is not limited to your job with your Employer.

> Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation.

AR-19.

The two other key provisions of the policy are the proof-of-loss provision and the definition of "physical disease."  Proof of loss is defined simply as "written proof that you are Disabled and entitled to [long-term disability] Benefits."  AR-11.  Physical disease is defined as "a physical disease entity or process that produces structural or functional changes in your body as diagnosed by a Physician."  AR-05.

## 2.  Short-Term Disability Policy

The short-term disability policy in effect in November 2003 provides coverage to disabled insureds for up to sixty days (after a thirty- or sixty-day waiting period).  AR-755 to - 781; AR-774.  The short-term policy defines disability in a way that is, in substance, similar to

---

[5]The policy includes a complementary exclusion in its definition of partial disability:  A claimant who *can* earn eighty percent of his predisability earnings is by definition not partially disabled.  AR-19 ("[Y]ou will no longer be Disabled when you are able to earn more than your Work Earnings Limit while working in another occupation."); AR-22 (defining "Work Earnings Limit" as "80% of your Indexed Predisability Earnings").

how disability is defined in the long-term policy, but the short-term policy uses somewhat different language.  Rather than defining two types of disability (as the long-term policy does), the short-term policy defines only a single type of disability — own-occupation disability — but, by means of that definition, provides coverage for partial disability.  The policy provides:

> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1.  You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
>
> 2. You suffer a loss of at least 20% in your Predisability Earnings when working in your Own Occupation.
>
> Note: . . . You may work in another occupation while you meet the Own Occupation definition of Disability.  However, you will no longer be Disabled when your Work Earnings from another occupation exceed 80% of your Predisability Earnings.[6]

AR-769.  In short, a beneficiary who is working at either his own occupation or at another occupation and earning less than eighty percent of his predisability earnings can be considered disabled under the short-term policy as long as he is unable to work full time or near full time at his own occupation.

Further, various provisions in the short-term policy encourage beneficiaries to work part time while they are receiving benefits.  AR-768 to -769.  For example, if a beneficiary is "able to work in [his] Own Occupation and able to earn at least 20% of [his] Predisability Earnings," then he *must* do so to be eligible for any benefits.  AR-769.

---

[6]The policy also provides:  "You will no longer be Disabled when your average Work Earnings over the last four weeks exceed 80% of your Predisability Earnings."  AR-768.  This is consistent with, but clearer than, the similar language in the definition of disability quoted in the text.

The definition of "own occupation" in the short-term policy is basically the same as the definition in the long-term policy.[7]  Physical disease is likewise defined the same in the short-term and long-term policies.  AR-05; AR-758.

The short-term policy's proof-of-loss provision, however, includes important language that is not found in the corresponding provision in the long-term policy.  Like the long-term policy, the short-term policy defines proof of loss as "written proof that you are Disabled and entitled to [short-term disability] benefits."  AR-762.  But the short-term policy continues:

> For claims of Disability due to conditions other than Mental
> Disorders, we may require proof of physical impairment that
> results from anatomical or physiological abnormalities which are
> demonstrable by medically acceptable clinical and laboratory
> diagnostic techniques.

*Id.*  This additional language will play a critical role in the Court's resolution of the disputes over Huberty's entitlement to coverage

### B.  Facts

#### 1.  Claim 1:  September 2000 Benefits Denial

Huberty held various computer-related and project-management jobs with Analysts beginning in 1988.  Analysts offered its employees both short-term and long-term disability insurance through policies with Standard.  Huberty was covered under both policies in 1999, when he first applied for benefits.

---

[7]Both policies provide that "own occupation" is not limited to the beneficiary's particular job; the short-term policy further says that Standard "may also look at the way the occupation is generally performed in the national economy."  AR-769.  With respect to the definition of "material duties," the short-term policy includes this new sentence:  "In no event will we consider working an average of more than 40 hours per week to be a Material Duty."  *Id.*

In late 1998, Huberty began to experience pain in his neck and back, and pain and numbness in his hands and feet. His primary-care doctor, Edward M. Dennison, M.D., referred Huberty to a physical therapist, but the therapy provided insufficient relief. In January 1999, an MRI scan of Huberty's cervical spine[8] showed that he suffered from spinal stenosis, a narrowing of the spine that creates pressure on the spinal cord and nerves and can cause pain.[9] AR-193. Jerone Kennedy, M.D., a neurosurgeon, believed that the stenosis explained Huberty's pain symptoms and diagnosed him with cervical myelopathy.[10] *Id.*; AR-88; AR-365.

In March 1999, Kennedy performed a decompressive laminectomy, which is a procedure in which the lamina (portions of the vertebrae) are removed.[11] AR-88; AR-365. The surgery was successful in relieving Huberty's spinal stenosis, but largely unsuccessful, as it turned out, in relieving his symptoms. AR-193; AR-366 to -367.

Huberty took off work in mid-March 1999, shortly before the surgery, and he filed a claim with Standard for short-term disability benefits in April. AR-88 to -89. Huberty saw Kennedy for follow-up visits regularly in April and May, and after each visit, Kennedy

---

[8]The cervical spine is basically the neck region of the spine. There are seven cervical vertebrae, labeled (from top to bottom) C1 to C7. U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Vertebra, cervical (neck)," http://www.nlm.nih.gov/medlineplus/ency/imagepages/1772.htm (last visited Feb. 6, 2008).

[9]*See* Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, U.S. Dep't of Health & Human Servs., *What is Spinal Stenosis?* 1 (2005), http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/spinal_stenosis_ff.pdf.

[10]"Cervical stenosis is the name for the actual narrowing of the canal, while cervical myelopathy indicates injury to the spinal cord and its function." N. Am. Spine Soc'y, *Cervical Stenosis & Myelopathy* 2 (2006), http://www.spine.org/Documents/cervical_stenosis_2006.pdf.

[11]*See* Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, U.S. Dep't of Health & Human Servs., *Handout on Health: Back Pain* 25-26 (2005), http://www.niams.nih.gov/Health_Info/Back_Pain/back_pain_hoh.pdf.

completed a short form indicating that Huberty was not yet ready to return to work.  AR-88; AR-98; AR-112.  Based on Huberty's claim form and Kennedy's post-surgery forms, Standard granted Huberty short-term disability benefits through June 9, 1999, which was the last day of the benefit period under the short-term disability policy.  AR-115.  Because Huberty remained disabled on June 9, however, Standard provided him long-term disability benefits beginning on June 10.  AR-137.

Huberty returned to work on a part-time basis on June 21.  AR-126.  As noted above, Standard's long-term disability policy permits beneficiaries to work part time and still collect disability benefits.

On October 6, 1999, Huberty saw a neurologist, Craig L. Hyser, M.D., because he was still experiencing the pain and numbness that the laminectomy six months earlier had been intended to correct.  Huberty reported trouble sleeping because of his symptoms.  At the time of the visit, Huberty was taking amitriptyline, which gave him some relief.[12]  AR-193.

Hyser did a neurological exam and assessed Huberty as having "bilateral hand and foot numbness and pain."  AR-192.  Hyser advised Dennison:  "This could all be the residual of a compressive cervical myelopathy, although I think we need to investigate the possibility of a peripheral polyneuropathy."[13]  Id.  Hyser recommended that Huberty return for an

---

[12]Amitriptyline is a tricyclic antidepressant that is sometimes prescribed for neuropathic pain as well as for fibromyalgia syndrome.  See William E. Cayley, Jr., M.D., *Antidepressants for the Treatment of Neuropathic Pain*, Am. Family Physician, June 1, 2006, http://www.aafp.org/afp/20060601/cochrane.html; Peter E. Baldry, *Myofascial Pain and Fibromyalgia Syndromes:  A Clinical Guide to Diagnosis and Management* 387 (2001) ("Amitriptyline is the most widely prescribed pharmacological agent for the treatment of [fibromyalgia syndrome].").

[13]"Peripheral neuropathy is a problem with the nerves that carry information to and from the brain and spinal cord. This produces pain, loss of sensation, and inability to control

- 8 -

electromyogram (EMG), a test that measures electrical activity in the muscles and can reveal nerve damage.[14]  *Id.*

The EMG, conducted in mid-October 1999, was "unremarkable" and showed no evidence of a polyneuropathy.  AR-196.  Based on the EMG results, Hyser concluded that Huberty's "limb sensory symptoms likely relate to a previous compromise of the cervical spinal cord.  It may take a year or more from the time of his decompressive surgery . . . for him to achieve full relief and it may not be complete."  *Id.*  Because Huberty complained of side effects from amitriptyline, Hyser prescribed Neurontin.[15]  *Id.*

Throughout the entire period of June to October 1999, Huberty regularly communicated with Standard.  He reported his hours worked every week, and he also provided a running update on his various medical issues and doctor's visits.  AR-139 to -147; AR-152; AR-160; AR-165; AR-171; AR-176.  After Huberty reported Hyser's findings, Standard asked Hyser to fill out a detailed questionnaire about Huberty's condition.  AR-181.

---

muscles. . . .  Peripheral neuropathy may involve damage to a single nerve or nerve group (mononeuropathy) or may affect multiple nerves (polyneuropathy)."  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Spinal Stenosis," http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm (last visited Feb. 6, 2008).

[14]U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Electromyography," http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (last visited Feb. 6, 2008).

[15]Neurontin is a brand name of gabapentin, an anti-seizure medication that is also used to treat certain types of pain arising from nerve damage.  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Gabapentin," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html (last visited Feb. 6, 2008).  Neurontin is not a narcotic, nor is it a controlled substance.  *See* Drug Enforcement Admin., U.S. Dep't of Justice, *Drug Scheduling*, http://www.usdoj.gov/dea/pubs/scheduling.html (last visited Feb. 6, 2008).

Hyser completed portions of the questionnaire. He diagnosed Huberty with cervical myelopathy (ICD9-CM 721.1) and sensory disturbance or "paresthesia"[16] (ICD9-CM 782.0).[17] AR-199. The questionnaire provided a series of checkboxes for indicating whether Huberty's assessment or treatment was complicated by malingering, exaggeration, drug dependence, or mental disorder, and Hyser did not check any of the boxes. AR-197. Hyser indicated that he expected Huberty's condition to improve, but could not say when. *Id.*

Hyser left many questions blank, however, and told Standard that the questionnaire was too detailed for him to fully complete. AR-191. Hyser recommended that Huberty undergo a "formal Functional Capacity Evaluation to address his work limitations."[18] *Id.*; *see also* AR-198. Standard did not follow up on Hyser's recommendation, and Huberty has apparently never had a functional-capacity evaluation.

---

[16] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching." Nat'l Inst. of Neurological Disorders & Stroke, U.S. Dep't of Health & Human Servs., "NINDS Paresthesia Information Page," http://www.ninds.nih.gov/disorders/parkinsons_disease/ (last visited Feb. 6, 2008).

[17] Diseases are classified in the United States health-care system according to the International Classification of Diseases, Ninth Revision, Clinical Modification, or "ICD-9-CM," which is overseen by the National Center for Health Statistics and the Centers for Medicare and Medicaid Services. Nat'l Ctr. for Health Statistics, U.S. Dep't of Health & Human Servs., *International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM)*, http://www.cdc.gov/nchs/about/otheract/icd9/abticd9.htm (last visited Feb. 6, 2008). Each ICD9-CM code represents a particular diagnosis.

[18] A functional-capacity evaluation or "FCE" is a test generally administered by a physical or occupational therapist to determine a patient's "safe functional abilities compared to the physical demands of work." Am. Physical Therapy Ass'n, *Guidelines: Occ. Health Physical Therapy: Evaluating Functional Capacity*, http://www.apta.org/AM/Template.cfm?Section=Policies_and_Bylaws&CONTENTID=29717& TEMPLATE=/CM/ContentDisplay.cfm (last visited Feb. 6, 2008), *archived at* http://www.webcitation.org/5VMrUG8Un.

In March 2000, Huberty returned to Dennison for a routine physical.  Dennison noted that Huberty continued to have "significant arm pains, neck pain that gets worse when he sits for long periods."  AR-315.  Dennison diagnosed Huberty as having continued symptoms of cervical myelopathy.  *Id.*  He suggested that Huberty return to Kennedy (the neurosurgeon who performed Huberty's laminectomy in March 1999) for follow-up and noted that Huberty might benefit from referral to a pain clinic.  *Id.*

Kennedy examined Huberty a few weeks later.  Kennedy observed:  "At this point, it is reasonable to assume that [Huberty] is suffering from neuropathic pain . . . ."  AR-322.  He therefore referred Huberty to a pain specialist, Ashish Shanbhag, M.D., "for consideration of a spinal cord stimulator, or other intervention."  *Id.*

Shanbhag evaluated Huberty a week later, in late March 2000.  AR-317 to -321.  Shanbhag found "significant myofascial tenderness" (i.e., muscle tenderness), diminished sensation in the thumbs and little fingers of both hands, and diminished proprioception (i.e., position sense) in both of Huberty's legs.  AR-318.   Shanbhag upped Huberty's Neurontin prescription and added a prescription for Elavil (a brand of amitriptyline).  *Id.*  Shanbhag noted, as Kennedy had, that Huberty might be a candidate for a spinal-cord stimulator in the future.  *Id.*

In mid-April 2000, Dennison ordered another MRI scan of Huberty's cervical spine.  AR-382 to -383.  Although the scan revealed some defects, Huberty's spine did not look significantly different than it had a year earlier, after his laminectomy.  AR-383.  Also in mid-April, Huberty saw Kennedy again.  Kennedy concluded that Huberty's problems could not be corrected surgically but also observed that Huberty was "still quite disabled by the neuropathic pain."  AR-323.

Huberty sought a second neurosurgeon's opinion.  In mid-May 2000, Huberty was seen by Arturo Camacho, M.D.  AR-384 to -385.  According to Camacho, Huberty's pain was "very vague and difficult for him to describe" and was "clearly not following a dermatomal pattern."[19] AR-384.  Camacho, like Kennedy, found that surgery would not be helpful.  AR-385.  Camacho noted his impression that Huberty suffered "[n]europathic pain in both the hands and the feet that is not radicular, which may relate back to the original cervical spinal stenosis."[20]  Id.  Camacho also agreed with Kennedy that Huberty might be a candidate for spinal-cord stimulation, but he deferred to the judgment of a pain specialist.  Id.

In April 2000, a new claims analyst at Standard, Brenda Babin, took over the administration of Huberty's benefits.  AR-265.  Babin noticed that Huberty, who had been regularly reporting his hours, appeared to be working close to eighty percent of full time, and she wondered whether his disability might have ceased.  AR-363.  Babin asked a medical consultant to review Huberty's medical records and determine whether he was still disabled.  AR-425.  She instructed the consultant to assess three things: first, Huberty's ability to work full time; second, the reasonableness of Huberty's stated restrictions given the medical documentation; and third, the likely prognosis and duration of Huberty's continued impairment.  Id.  Babin further told the consultant that Huberty was working "close to the 80% activity level in his own occupation" and

---

[19]A person's skin can be divided into "dermatomes," that is, areas of skin that are innervated by particular nerves originating between specific vertebrae.  A dermatomal pattern of pain or impaired sensation indicates damage to the particular nerve that innervates the affected dermatome.  Merck Research Labs., *Merck Manual of Medical Information — Second Home Edition*, "Spinal Cord Disorders — Introduction" (2007), http://www.merck.com/mmhe/sec06/ch093/ch093a.html.

[20]"Radicular pain" is pain resulting from irritation of a spinal nerve or its roots.  Grant Cooper, *Blueprints:  Orthopedics* 62 (2005).

that she believed that his job (computer programmer) was sedentary. *Id.* She provided the consultant with no other information about Huberty's job or the terms of his insurance policy. *See id.*

In connection with Standard's reevaluation of Huberty's claim, Dennison completed in late June 2000 an "attending physician's statement" about Huberty. AR-419. Dennison reiterated his earlier diagnosis of cervical myelopathy and described Huberty's symptoms as "continuous arm pain, leg pain, paresthesias involving hands, feet." *Id.* Dennison noted that Huberty was taking Zoloft (an antidepressant), oxycodone (an opiate painkiller), and Neurontin. Dennison indicated that Huberty could work twenty-five to thirty hours per week, which is how much Huberty (who filled out a portion of the form) said that he was then working. *Id.*

In mid-September 2000, Standard's medical consultant, Elias Dickerman, M.D., completed his review of Huberty's medical records. AR-460 to -462. Dickerman, a neurologist, questioned whether Huberty ever suffered from cervical myelopathy. AR-460. He also noted that Huberty "remains at the 80% activity level in his own occupation" — an occupation that Dickerman said "is considered to be sedentary." AR-461. Dickerman pointed out that Huberty's neurological exams were generally normal, with the exception of showing "a non-dermatomal sensory deficit suggestive of peripheral neuropathy but not corroborated by electrodiagnostic studies . . . ." AR-460. Based on these medical findings, "and considering that the record reveals that on many days [Huberty] in fact works a usual 8 hour day, there is no medical evidence to support the contention that [Huberty] is unable to perform work activity on a full-time basis." *Id.*

In a letter dated September 25, 2000, Standard told Huberty that he was no longer eligible for long-term disability benefits.  AR-474 to -477.  Standard's decision was based on Dickerman's report and Standard's review of Huberty's medical records.  Standard concluded:

> In summary, the compelling medical evidence does not support a level of impairment that would preclude you from working at the sedentary to light physical capacity level on a full-time basis and you retain the ability to earn at least 80% of your indexed predisability earnings irregardless [*sic*] of whether or not you are actually earning 80%.

AR-476.  Standard acknowledged that Huberty had "a medical condition, which causes you some discomfort," but asserted that "this discomfort would not prevent you from performing the requirements of your own occupation as a computer programmer."  AR-475.

Huberty immediately protested.  In a letter dated October 12, 2000, Huberty argued that Standard's decision had not been based on his most recent medical information, particularly information from the pain clinic where he was being treated.  AR-480 to -481.  Huberty included with his letter a statement from Dennison and a "work ability" form from a pain-clinic doctor, Edrie Kioski, M.D.  AR-482 to -483.  Dennison reported:

> Patient has been seen by neurology and exam is consistent with cervical myelopathy with decrease in sensation over the hands and feet, decrease in vibratory sense in the toes.  Patient is currently undergoing treatment of the above problems at the pain clinic with chronic pain medications including OxyContin,[21] oxycodone and Neurontin.  It has been recommended that he be seen by an orthopedist to consider fusion at C3-6 levels.
>
> Because of this I don't feel that he can work at the desired level of 6-8 hours.  His condition has deteriorated over the summer and the pain clinic has had to be more aggressive with their treatments.

---

[21]OxyContin is the brand name of a time-release formula of oxycodone.  Drug Enforcement Admin., U.S. Dep't of Justice, "OxyContin," http://www.usdoj.gov/dea/concern/oxycontin.html (last visited Feb. 6, 2008).

AR-482.  Kioski, in the "diagnosis" section of the work ability form, indicated that Huberty had cervical myelopathy and neuropathic foot and hand pain, and that he had undergone laminectomies.  AR-483.[22]  Kioski opined that Huberty could work a maximum of four hours a day and noted that Huberty was going to get a second opinion from a surgeon about his neck, and "after that, recommend disability eval[uation]."  *Id.*

Standard forwarded Dennison's letter and Kioski's form to Dickerman and asked whether they changed his earlier opinion.  AR-502.  Dickerman responded in late November 2000 that they did not.  AR-508.  Dickerman noted that Kioski had not included any medical records with his form, and Dickerman reiterated his disagreement with the diagnosis of cervical myelopathy.  *Id.*  Dickerman wrote:

> I do not find any medical evidence to justify the claim that the patient can only work four hours per day.  At the time of my previous report the patient was working at 80% time, and I was of the impression and opinion that he could work on a full-time basis since on many days he was already working 8 hours per day.  That remains my impression, and I see no justification to change that impression from the recently submitted additional records.

*Id.*

Also in late November 2000, Huberty provided Standard (at Standard's request) a list of medications he was taking.  AR-507.  Huberty reported that he was taking the maximum dose of Neurontin; Zoloft; oxycodone; OxyContin; Klonopin;[23] and Tagamet.[24]  Huberty commented:

---

[22]By means of a series of check boxes for different physical capabilities, Kioski indicated that Huberty was totally incapable of: bending; twisting; kneeling; reaching overhead; and climbing stairs or a ladder.  Kioski also indicated that Huberty could sit frequently (34 to 66 percent of the time) but not continuously, and could stand or walk only occasionally (0 to 33 percent of the time).  AR-483.

[23]Klonopin, a brand name of clonazepam, is (like Neurontin) an anti-seizure medication that is also sometimes used to treat pain.  U.S. Nat'l Library of Medicine & NIH, Medline Plus

> Even before they doubled my Oxy[C]ontin, I have had trouble
> concentrating and being able to focus and read. . . . Since they
> have increased the dosage of Oxy[C]ontin, I have not been able to
> read for more than 15/20 minutes at any time without my eyes
> becoming blurry and I am unable to read.  And that is with wearing
> my reading glasses.  Without my glasses, I cannot even focus for
> more than 5 minutes.

*Id.*  Babin then asked a registered nurse, Mary Hosack, whether Huberty's medications were

impairing.  Hosack concluded that they were not.  According to Babin's notes of her

conversation with Hosack:  "These can be adjusted by his physician if causing problems.  Also

after taking meds for a while — side effects such as those Mr. Huberty indicates would

disappear.  [Hosack] sees nothing that would prevent him from working [full time] especially

since it does not prevent part-time work."  *Id.*

Based on Hosack's and Dickerman's opinions, Standard upheld its termination of

Huberty's benefits in a letter dated December 6, 2000.  AR-509 to -510.  Standard rejected

Kioski's conclusion that Huberty could only work four hours a day because that opinion "was

not supported by any documented medical evidence."  AR-510.  Standard also characterized the

form submitted by Kioski as "essentially indicat[ing] that you are capable of performing in a

sedentary capacity."[25]  *Id.*  Standard discounted Dennison's letter because it "add[ed] no new

———————

— Drugs & Supplements, "Clonazepam,"
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682279.html (last visited Feb. 6,
2008).

[24]Tagamet, a brand name of cimetidine, is an over-the-counter drug for treating ulcers
and gastroesophageal reflux disease.  U.S. Nat'l Library of Medicine & NIH, Medline Plus —
Drugs & Supplements, "Cimetidine,"
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682256.html (last visited Feb. 6,
2008).

[25]This is, at best, only partly true:  Kioski's answers on the form could be construed to
indicate that Huberty was physically capable of sedentary work for up to four hours a day.  *See*

information" and because Dickerman disagreed with Dennison's diagnosis of cervical myelopathy. AR-509. Finally, Standard rejected the notion that Huberty was impaired by his medications, telling him that his medications could be adjusted by his doctor and that his side effects "should disappear." *Id.* Standard commented that the medications did not prevent full-time work "especially since they do not seem to be impairing your part-time work activity." *Id.*

Standard did not, however, question the reality of Huberty's symptoms; it questioned only their intensity. Standard commented: "Please understand that we do agree you have a medical condition which may be causing you some discomfort. However, this medical condition is not severe enough to prevent you from performing the material duties of your own sedentary occupation on a reasonably consistent basis." *Id.*

When Standard made this decision, in December 2000, to uphold its termination of Huberty's benefits, Standard did not have all of Huberty's medical records. In particular, Standard did not have complete records from the pain clinic where Huberty had been treated throughout the summer and fall of 2000. The only record related to that treatment in Standard's possession was the work ability form completed by Kioski. Although both Huberty and Standard were aware that the pain-clinic records were missing, Huberty asked Standard to decide his appeal of Standard's decision to cut off his benefits without the records. AR-491 to -493.

Standard then referred Huberty's file to its quality-assurance division for additional review. But while that review was pending, Huberty provided Standard additional medical records, some of which related back to his treatment at the pain clinic, and others of which suggested that Huberty might have multiple sclerosis. The quality-assurance division therefore

AR-483.

returned Huberty's file to Babin for consideration of the newly provided records, which are summarized below.

In late June 2000, Huberty was seen at the pain clinic by Bradley Helms, M.D.  AR-512 to -514.  Helms noted that Huberty "had trouble describing [his] pain as being in any particular dermatomal distribution in the hands or the feet with the possibility of perhaps being a little bit more so in the C5 distribution."  AR-514.  Helms found that Huberty had "pain to axial loading" and considered him to be a candidate for epidural steroid injections.[26]  AR-513; AR-512.  Helms prescribed Percocet but declined to prescribe any long-acting narcotics because he found Huberty to be "relatively narcotic naive."  AR-512.

In late July 2000, Huberty returned to the pain clinic and was given an epidural steroid injection by Stephen Wagner, M.D.  AR-515 to -516.  Wagner commented:

> Somewhat unusual presentation for cervical myelopathy with isolated hand and foot pain and aching with activity.  However, this can be consistent with known cervical pathology and he does have symptoms at times with neck pain with shooting pains into his shoulders with some extension down his arms and then into his hands.

AR-516.

At a follow-up visit in mid-August 2000, Huberty told a registered nurse at the pain clinic, Madonna McDermott, that the epidural steroid injection had not helped.  AR-517 to -518.

---

[26]It is unclear what Helms meant by "pain to axial loading," and neither party discusses this finding.  "Axial loading" is downward pressure on the head.  If a patient reports low-back pain from axial loading, this is sometimes taken to signify that the patient is either malingering (this is one of "Waddell's signs" of malingering) or has nonorganic pain, because axial loading should not, physiologically, cause low-back pain.  *See* Steven Greer et al., *Clinical Inquiries: What Physical Exam Techniques Are Useful to Detect Malingering?*, J. Family Practice, Aug. 2005, http://www.jfponline.com/pages.asp?aid=2035.  Huberty generally complained of neck and arm pain, however, and *neck pain* from axial loading *could* result from a physiological cause.  *See* Gordon Waddell, *The Back Pain Revolution* 186 (2d ed. 2004).

McDermott noted that Huberty reported "significant sleep disturbance secondary to pain" and she found (as had Helms) that Huberty had pain to axial loading.  AR-518.  She adjusted Huberty's medications.[27]  AR-517.

In late September 2000, Huberty saw Kioski at the pain clinic.  AR-522.  Kioski hypothesized that bone spurs disclosed in Huberty's earlier MRI scans "could cause a radiculopathy that would explain his current symptoms."  *Id.*  Kioski noted that he would look into whether a cervical fusion might help Huberty, and that he would seek the opinion of an orthopedic surgeon, Paul Hartleben, M.D.  *Id.*

In mid-October 2000, Huberty saw another pain-clinic doctor, Todd Hess, M.D.  AR-519 to -521.  Hess observed, "[t]his is obviously a difficult pain problem," and commented that he was "concerned about some of the pain behaviors I did see today."  AR-520.  Hess noted that Huberty was morbidly obese and opined that reconditioning — that is, exercise — might improve Huberty's symptoms.  *Id.*  Hess did not, however, recommend starting any significant reconditioning program until after getting a second surgical opinion.  With respect to Huberty's medication, Hess noted that he saw no signs of addiction.  *Id.*  As for the physical exam, Hess

---

[27]McDermott recommended discontinuing Huberty's Neurontin, starting him on Klonopin and oxcarbazepine (another anti-seizure medication), and continuing with oxycodone until switching to OxyContin.  AR-518; *see* U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Oxcarbazepine," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601245.html (last visited Feb. 6, 2008).

noted "cogwheel rigidity,"[28] "vague sensory changes which are nondermatomal in nature," and "significant pain behavior." AR-519 to -520.

In late November 2000, Huberty again saw Kioski, who refilled and increased Huberty's pain medications and scheduled a follow-up EMG. AR-593. Hyser, the same neurologist who treated Huberty in 1999, conducted the EMG on December 12, 2000. AR-531 to -532. The EMG disclosed mild bilateral carpal tunnel syndrome, as well as "[i]solated chronic neurogenic changes in the left biceps muscle without any additional abnormalities which would definitely conform to a left C5/6 radiculopathy." AR-531.

Huberty saw Kioski at the pain clinic ten days later. AR-591. Kioski reduced Huberty's Neurontin because of side effects. Kioski also commented on the EMG results, which he appears to have misunderstood. Unlike Hyser, Kioski interpreted the EMG to show evidence of a left C5-6 radiculopathy.[29] Id.

In early January 2001, Huberty underwent another diagnostic procedure, a cervical discography. AR-601 to -602. The discography was recommended by Hartleben, who saw Huberty in mid-December 2000 on Kioski's referral. See AR-591. Discography is a procedure

---

[28]Cogwheel rigidity is one of the main symptoms of Parkinson's disease. It is displayed when a clinician "tries to move the patient's arm, which will move only in ratchet-like or short, jerky movements . . . ." Nat'l Inst. of Neurological Disorders & Stroke, U.S. Dep't of Health & Human Servs., "Parkinson's Disease: Hope Through Research," http://www.ninds.nih.gov/disorders/parkinsons_disease/detail_parkinsons_disease.htm (last visited Feb. 6, 2008).

[29]Kioski's apparent confusion seems to have resulted from Hyser's use of the word "which" restrictively rather than nonrestrictively. That is, Kioski read "which" to be nonrestrictive, and therefore understood Hyser's note to mean that the EMG showed "chronic neurogenic changes without any additional abnormalities — *which* [i.e., the changes] *would* definitely conform to a left C5/6 radiculopathy." But most doctors who reviewed the EMG results understood Hyser's note to mean that the EMG showed "chronic neurogenic changes[,] *without* any additional *abnormalities* that would definitely conform to a left C5/6 radiculopathy."

designed to determine whether a damaged disc is the source of pain in someone who is suffering

from back or neck pain.  "During discography, contrast medium is injected into the disk and the

patient's response to the injection is noted; provocation of pain that is similar to the patient's

existing back or neck pain suggests that the disk might the source of the pain."[30]

Earlier imaging studies had already established that Huberty had "quite advanced

cervical degenerative disk disease . . . ."  AR-708.  The discography was also abnormal; Huberty

exhibited "evidence of similar or concordant pain . . . at the C4-5 and C6-7 intervertebral disc

space levels . . . ."  AR-601.  Huberty also exhibited signs of non-concordant pain at the C3-4

level.  *Id.*

On January 19, Huberty had another MRI scan, which showed a "minimal area of

demyelination" that suggested the possibility of multiple sclerosis.[31]  AR-529.[32]  That possibility

was later ruled out through lab tests, but Standard, without having received those lab tests,

upheld for a second time its decision to cut off Huberty's benefits.  *See* AR-1057 to -1058; AR-

1067 to -1071; AR-620.

Standard forwarded the pain-clinic records described above and the results of Huberty's

discography to Dickerman.  Dickerman noted, in a report to Standard dated January 23, 2001,

---

[30]Steven A. Barna et al., eMedicine, "Discography,"
http://www.emedicine.com/neuro/topic709.htm (last visited Feb. 6, 2008).

[31]"Demyelination" is the breakdown of the myelin sheath that surrounds nerve fibers.
U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "CSF myelin basic
protein," http://www.nlm.nih.gov/medlineplus/ency/article/003370.htm (last visited Feb. 6,
2008).

[32]Records provided to Standard by Huberty in 2004 show that this MRI was ordered by
David Walk, M.D., at the University of Minnesota, to whom Hyser referred Huberty for a
consultation.  AR-1290.

that the records showed "a subjective increase in pain symptomatology, with no change in the

patient's neurological examination." AR-605. Dickerman discounted the results of the

discography, saying: "Except for indicating that [Huberty] has pain at all levels of the spine

tested, this test has no reasonable or useful information." *Id.* Standing by his September and

November 2000 reports, Dickerman concluded: "In spite of [Huberty's] increase in subjective

pain complaints, there have been no changes in [his] neurological examination, which continues

to reveal no focal neurological deficits." *Id.* Dickerman did not, in this report, consider the

results of Huberty's December 2000 EMG.

Dickerman then issued a second report, in late February 2001, after he considered both

the EMG results and Huberty's January 19 MRI scan. AR-547. Dickerman agreed that the

EMG showed that Huberty might have "very early carpal tunnel syndrome," but did not consider

this disabling given Huberty's "normal examination." *Id.* Similarly, with respect to multiple

sclerosis, Dickerman said that "considering that [Huberty's] neurological examination remains

normal, regardless of diagnosis, [Huberty] can continue to perform his work activities with no

change at this time." *Id.* In summarizing and affirming his earlier reports, Dickerman said:

> The most relevant portion of [Huberty's] records is the fact that
> although [he] has had cervical spine surgery and has had
> symptoms of numbness in the hands and lower extremities, that
> [*sic*] [his] most recent neurological examination by a board
> certified neurosurgeon revealed no focal neurological deficits.
> You may also recall that [Huberty] was working as a computer
> analyst 80% of the time.

AR-547.

In a letter dated March 7, 2001, Standard again affirmed its decision to cut off Huberty's

benefits in September 2000. AR-617 to -620. Standard closely paraphrased Dickerman's late-

February report, telling Huberty that "[a]lthough you have had cervical spine surgery and have

- 22 -

had symptoms of numbness in the hands and lower extremities, the most recent neurological

examination by a board certified neurosurgeon revealed no focal neurological deficits."  AR-

620.  Standard concluded by saying:

> We . . . understand that you may experience discomfort due to
> your back pain.  However, we do not find that the medical
> evidence supports that you are disabled from performing sedentary
> work. . . .  [W]e have concluded that you retain the physical
> capacity to perform the material duties of your own occupation.
> We found insufficient medical evidence to support your stated
> level of impairment.  Therefore, we are upholding the closure of
> your claim at this time.

AR-618.

Standard then once again referred Huberty's file to its quality-assurance division.  AR-

659.  Huberty retained counsel who, in mid-March, asked Standard to postpone its decision on

Huberty's appeal.  AR-667.  Over the next several months, Huberty provided to Standard

additional medical records and more information about his job at Analysts.  The medical records

documented Huberty's ongoing treatment at the pain clinic, two separate psychological

assessments, and his second spine surgery.  Those records are summarized below.

In early February 2001, Huberty underwent a psychological assessment at a chronic-pain

rehabilitation clinic.  The assessment was requested by Hartleben and Dennison to determine

whether Huberty was psychologically prepared to undergo a second major spine surgery.  AR-

640; AR-638.  The assessment was done by Kathryn Selmo, M.D., with assistance from a

registered nurse.  AR-633.

Huberty told Selmo that chronic pain "interfer[ed] with his activities of daily living

approximately 90%."  AR-639.  Selmo remarked that Huberty exhibited pain behavior ("some

guarding and grimacing with palpation").  AR-637.  With respect to Huberty's pain medications,

Huberty "describ[ed] responsible use" of the medications and said that they hurt his work performance by diminishing his concentration, causing blurry vision, and causing reading difficulties. AR-641. In the "impression" section of her assessment, Selmo listed not only "[m]echanical pain in the cervical spine with a secondary myofascial component," but also "[a] pain disorder with both a psychological factor and a general medical condition"[33] and "[c]hronic pain syndrome."[34] AR-635.

In mid-February 2001, Huberty was again seen at the pain clinic by Kioski, who adjusted his medications. AR-686 to -687. Kioski noted that Huberty was scheduled to see Hyser to rule out multiple sclerosis before surgery would be considered. AR-687. In the "assessment" section of his chart note, Kioski wrote: "Neck pain secondary to degenerative disc disease. . . . He also has neuropathic radicular pain." *Id.* Kioski commented that Huberty had "no overt pain behavior today." *Id.*

Also in mid-February 2001, Huberty had another psychological assessment. AR-624 to -629. A psychologist, C.L. Moore, diagnosed Huberty with depressive disorder not otherwise specified (ICD9-CM and DSM-IV-TR code 311). AR-625. In the "impression" section of his chart note, Moore wrote:

---

[33]Selmo did not list diagnostic codes in her report. Her "impression," however, corresponds to psychiatric diagnosis code 307.89, "Pain disorder associated with both psychological factors and a general medical condition," in the ICD9-CM and the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition – Text Revision ("DSM-IV-TR"). Am. Psychiatric Ass'n, DSM-IV-TR 499 (2000).

[34]The diagnosis of "chronic pain syndrome" was added to the ICD9-CM as diagnostic code 338.4 effective October 2006. Am. College of Physicians, *Make Sure Your Diagnosis Codes Match ICD-9 Changes*, ACP Observer, Oct. 2006, http://www.acponline.org/clinical_information/journals_publications/acp_internist/oct06/codes.htm. It is classified as a neurological diagnosis. *See* Nancy Clark, *Intro to ICD-9 Coding* 10, http://med.fsu.edu/informatics/ICD-9.ppt (last visited Feb. 6, 2008).

> Mr. Huberty's experience of pain significantly impairs his ability
> to function on a full time basis of 40 hours or more at his work.  It
> is readily apparent Mr. Huberty is unable to sit for extended
> periods of time.  He seems to be unable to work more than 15 to 20
> hours per week due to his pain and the effect of the multiple
> medications he is taking, which impair his ability to concentrate
> sufficiently to meet his job performance standards.

*Id.*[35]

At the end of March 2001, Huberty again saw Kioski, who noted that Huberty was "having a terrible time with his neck pain" and was "tense today and in obvious pain."  AR-689.  In the "assessment" section of his chart note, Kioski wrote:  "Degenerative disc disease of the cervical spine, fairly severe.  Patient is anticipating surgery."  *Id.*

Hartleben, Huberty's orthopedic surgeon, saw Huberty for an office visit on April 6, 2001.  AR-706 to -707.  Hartleben "advised [Huberty] of his diagnosis which is symptomatic mechanical neck pain[,] status post multiple level cervical laminectomy for myelopathy," and noted that C4-5 and C6-7 had been symptomatic on discography.  AR-707.[36]  Over the next few weeks, leading up to the surgery, Huberty attempted to taper off of narcotics.  AR-691.  Records from the pain clinic indicate that Huberty wanted to be on a low dose of narcotics after the surgery so that he could better assess the results.  *Id.*

On April 30, Hartleben operated on Huberty and fused his cervical vertebrae.  AR-1084 to -1085.  The surgery went well at the time, and a few weeks later, Huberty reported significant pain relief.  AR-706.  But follow-up imaging disclosed that some screws had come loose and that

---

[35]When Huberty saw Moore again a few weeks later, Moore noted that Huberty was "not in an emotional state at this time to discuss plans for therapy."  AR-1131; AR-1130 to -1131.  But the record of this visit was not provided to Standard until February 2004.

[36]Records from the surgery confirm that it was done because of "discography proven significantly positive for concordant symptoms at C4-5 and C6-7."  AR-1085.

Huberty's seventh cervical vertebra was fractured.  AR-702 to -703.  To fix these problems, Hartleben did a second surgery on May 25.  AR-1086 to -1089.  Follow-up imaging showed that the fusion was successful.  AR-1090 to -1091.

In mid-July 2001, Kioski filled out a "residual functional capacity" ("RFC") questionnaire.  AR-716 to -720.  Although the questionnaire was dated July 2001, it was based on Kioski's September 2000 evaluation of Huberty — that is, it was intended to supplement the one-page work ability form that Standard had already received (and had discounted because it was unaccompanied by medical records).  AR-720; AR-716.  On the RFC questionnaire, Kioski listed Huberty's diagnosis as "cervical degenerative disc disease" rather than cervical myelopathy.  AR-720.  Kioski described Huberty's symptoms as "[n]eck pain, going down to both shoulders [and] hands.  Foot pain bilaterally.  Leg weakness with walking."  *Id.*  He further described Huberty's pain as constant, worse with activity, and with an intensity level of six to seven on a ten-point scale.  *Id.*  But Kioski left much of the RFC questionnaire blank and commented that the questions he left blank "were not part of my brief visit with Mr. Huberty on 9/25/00."  AR-716.[37]

---

[37]In response to the instruction to "[i]dentify any positive objective signs" for patients with pain, Kioski answered only "[m]uscle weakness anterior tibia."  AR-719.  Kioski did not respond to the instruction, "Identify the clinical findings, laboratory and test results which show your patient's medical impairments."  AR-720.  Among the questions he did not answer were the following: "Is your patient a malingerer?"  AR-719.  "Do emotional factors contribute to the severity of your patient's symptoms and functional limitations?"  *Id.*  "Are your patient's impairments (physical impairments plus any emotional impairments reasonably consistent with the symptoms and functional limitations described in this evaluation?"  *Id.*  "How often is your patient's experience of pain severe enough to interfere with attention and concentration?"  *Id.*

Huberty's counsel asked Standard in August 2001 to reinstate his benefits in light of the records described above.  AR-722 to -723.  By the end of 2001, Huberty was working roughly four to six hours a day.  AR-1315.

Standard asked an internal-medicine doctor, Bradley Fancher, M.D., to review Huberty's file and Dickerman's memos from 2000 and 2001.  Fancher wrote a one-paragraph memo on January 16, 2002, in which he supported Dickerman's earlier conclusions about Huberty's status. AR-737.  It is not entirely clear what records Fancher reviewed — he says that he reviewed "pertinent parts" of Huberty's file on the day he wrote his memo, as well as Dickerman's memos — but Fancher was at least aware of Huberty's fusion surgery.  Fancher commented, "I note that the claimant has subsequently undergone surgery with some amelioration of his symptoms. While I am very pleased for the claimant that this has occurred, it has not materially changed the assessment of the claimant's impairment prior to his most recent surgeries."  *Id.*

Standard also sought Dickerman's opinion once again, in part because Dickerman's earlier opinions had been based on incorrect information about Huberty's hours.  Standard told Dickerman that in the past, Standard had overstated the amount of time that Huberty was working.  AR-734.  Dickerman supplemented his earlier opinions in a memo dated January 21, 2002 in which he wrote:

> There is no new medical evidence to be considered.  However, in the prior reports, I had been under the impression that this patient was working close to 80% of the time, and that on some occasions he had been working up to 8 hours per day.  Based on the new information that you have provided . . . it would appear that between March and June of 2000 his average hours were close to 25 hours per week, and he did not apparently work any day 8 hours per day.  Between July and September of 2000 he worked probably 15 hours per week.  Except for correcting the amount of time that this patient was working, there is no information that would change the conclusions reached in the prior reports.  Namely, this

patient has been capable of performing full-time sedentary work,
as previously noted.  The revision as to the number of hours
worked does not change that conclusion.

AR-738.[38]

In a letter dated January 23, 2002, Standard upheld for the third and final time its

September 2000 decision to terminate Huberty's benefits.  AR-747 to -752.  With respect to

Huberty's argument that Standard's decision was flawed because it was based on an inaccurate

job description, Standard concluded that regardless of Huberty's exact title or assignment, his

job "would not require in excess of sedentary or light work strength requirements . . . ."  AR-

749.  After summarizing Huberty's medical records, Standard said:

> [T]he medical records document there have been no focal
> neurological deficits on physical examination and no evidence of
> radiculopathy or polyneuropathy on diagnostic testing following
> the cervical laminectomy performed in March 1999.  Although Mr.
> Huberty reported an increase in his pain complaints following the
> closure of his claim in September 2000 the neurological
> examination continued to demonstrate normal reflexes and normal
> sensory and motor findings.  As the medical evidence does not
> support Mr. Huberty was unable to earn more than the own
> occupation income level while he was working in his own
> occupation the closure of his claim on September 19, 2000 is
> correct and must be upheld.

AR-748.

Huberty filed a lawsuit to challenge Standard's denial of benefits in September 2002.

*Huberty v. Standard Ins.*, No. 0:02-CV-3693 (D. Minn.).  By that time, Huberty had been

working full time for about three months since having returned to work part time a year earlier

---

[38]The meaning of Dickerman's statement that he considered "no new medical evidence"
is unclear.  On the one hand, it could mean that Standard did not provide him any of the medical
records that Standard received from Huberty after February 2001 (the date of Dickerman's
previous report).  On the other hand, the statement could mean that Dickerman received the
records but did not consider them to contain "new medical evidence."

(after his fusion surgery). *See* Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 28 [Docket No. 24].

The parties agreed to dismiss the lawsuit without prejudice in October 2003. By then, Huberty was seeking disability benefits from Standard for a newly filed claim.

### 2.   Claim 2:  November 2003 Benefits Denial

In a claim form dated September 23, 2003, Huberty indicated that a disability prevented him from working because "cannot concentrate, fall asleep, in constant pain, cannot drive any distance, fall asleep behind wheel of car, started to get very [jerky?] at work." AR-826. Huberty listed September 15 as his last active day at work. At that point, Huberty had been working full time since June 2002. He was scheduled to be laid off at the end of September 2003. *See* AR-958; AR-1127.

On his claim form, Huberty indicated that his disability dated back to 1998, that "surgery in 1999 made things worse," and that "surgery in 2001 helped temporarily." AR-826. Huberty further commented, "I have done everything that the doctors have asked (drugs and surgeries) and have tried different doctors that specialize in c[h]ronic pain to no avail." *Id.*

Dennison filled out the "attending physician's statement" portion of the claim form. AR-825. The diagnosis and symptoms listed were, respectively, "neck pain/cervical my[el]opathy" and "pain in his neck, burning." *Id.* To describe Huberty's "physical, mental and cognitive limitations," Dennison wrote: "bilateral arm/leg pain, paresthesias, [n]eck pain worsened by any activity — including sitting, bending, lifting, twisting. Significant depression [secondary] to above. [Decreased] alertness/concentration." *Id.* Dennison assessed Huberty as being capable, in a given day, of sitting for two hours, standing for one hour, walking for one hour, and never

bending or stooping.  Dennison commented that these activities were "severely limited due to neck pain and extremity pain."  *Id.*

Based on this claim form, Standard approved Huberty's claim for short-term disability benefits from September 16 through November 30, 2003.  AR-867 to -868.  Standard told Huberty that it would need "documentation that your present medical condition will be disabling beyond" November 30 before it would provide any more benefits.  AR-868.  The maximum period for short-term benefits ran through December 14, 2003.  *Id.*

On November 18, Dennison completed an "ortho/neuro questionnaire" that Standard had provided.  AR-870 to -872.  Dennison listed a primary diagnosis of "cervical myelopathy with cervical laminectomies C4-6" and a secondary diagnosis of polyneuropathy.  AR-872.  He described Huberty's symptoms as cervical pain, paresthesias or sensory disturbances in a radicular or dermatomal pattern, and bilateral hand and foot pain.  *Id.*  Dennison indicated that Huberty had only sixty to eighty percent range of motion in his neck.  *Id.*  With respect to findings from diagnostic imaging, Dennison indicated that MRI or CT scans confirmed the disease[39] and that an August 2002 EMG showed "chronic neurogenic changes left biceps muscle."  AR-871.  In response to the question whether the objective tests correlated with the clinical findings, Dennison commented, "EMG/MRIs done initially correlate [with diagnosis] of cervical spinal stenosis — subsequent laminectomy and fusion."  *Id.*

In assessing Huberty's functional capabilities, Dennison affirmed "[b]ased upon objective findings" that Huberty was totally and permanently unable, in a work day for any

---

[39]Below the check box for "MRI or CT scans confirm disease," Dennison wrote, "cervical laminectomy for stenosis" and "cervical [degenerative disk disease]."  AR-871.

employer, to sit, stand, or walk.[40]  *Id.*  Dennison also indicated that Huberty could not use either hand for simple grasping, for pushing or pulling, for fine manipulation, or for activities such as typing that require finger dexterity.  *Id.*  Dennison indicated that he expected that Huberty's condition would never change; Dennison therefore wrote "unable" in the space for "anticipated return to work date."  AR-870.

In response to a question about factors that might complicate assessment and treatment, Dennison checked a box for depression, but he left blank the boxes for malingering, exaggeration, and dependence on medication.  *Id.*  Dennison indicated that Huberty was taking

---

[40]Dennison could not have meant this.  Huberty was obviously capable of sitting, standing, and walking for at least a few minutes every day.  After all, he was showing up at Dennison's office for his appointments.

many medications: Ritalin,[41] Neurontin, Mirapex,[42] Topamax,[43] Lexapro,[44] Tagamet, and Allegra (an over-the-counter allergy medicine).

After receiving the questionnaire, Standard asked Dennison for more records.  AR-899. Dennison responded by providing his chart notes from three visits, one each in September, October, and November 2003.  AR-908 to -909.

The first chart note, from a September 9 visit, reflects that Huberty had recently seen a neurologist, Charles Ormiston, M.D., "with significant pain in his neck" and that Ormiston had ordered a CT scan.  AR-908; *see also* AR-1004.  The note also indicates that Huberty was seeing a psychiatrist, Craig Vine, M.D.  AR-908; *see also* AR-964.  With respect to Huberty's symptoms, Dennison reported:

_____

[41]Ritalin is a brand name of methylphenidate, a stimulant used to treat attention deficit hyperactivity disorder (ADHD) as well as narcolepsy.  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Methylphenidate," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682188.html (last visited Feb. 6, 2008).  Huberty was prescribed Ritalin for excessive daytime sleepiness.  AR-909.

[42]Mirapex is a brand name of pramipexole, a medication for treating Parkinson's disease and restless-leg syndrome ("RLS").  RLS is "a condition that causes discomfort in the legs and a strong urge to move the legs, especially at night and when sitting or lying down."  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Pramipexole," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697029.html (last visited Feb. 6, 2008).

[43]Topamax is a brand name of topiramate, an anti-seizure medication. U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Topiramate," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697012.html (last visited Feb. 6, 2008).  Topamax is also prescribed off-label for neuropathic pain.  Brude Goldfarb, *FDA Approves Drugs for Peripheral Neuropathy*, DOC News, Mar. 1, 2005, http://docnews.diabetesjournals.org/cgi/content/full/2/3/1-a.

[44]Lexapro is a brand name of escitalopram, an antidepressant.  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Escitalopram," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html (last visited Feb. 6, 2008).

> He says he is doing a lot worse.  He has ongoing pain in his neck,
> ongoing paresthesias, hand pain, leg pain.  His work exacerbates
> his situation.  He can no longer do his job, he feels like he cannot
> perform, he is falling behind with his work, and when he gets done
> at the end of the day, he is miserable.  He has been to the pain
> clinic, has tried multiple modalities, but nothing has been helpful
> for him.

AR-908.  Dennison wrote, "I told [Huberty] I would support his decision to pursue disability.  I do not feel that work is helping his situation at all and is actually making it worse for him."  *Id.*

Dennison's October 2003 chart note says that Huberty saw Ormiston and "got some benefit" from trigger-point injections in his cervical vertebra.  AR-909.  Dennison commented, with respect to his exam of Huberty, "[h]e is alert and oriented.  Neck is tender, range of motion is limited due to pain.  Upper extremity strength testing is normal.  He describes numbness and tingling and burning pain in his hands and feet."  AR-908.

Dennison's November 2003 note says that Huberty "is here to follow-up on his chronic neck pain" and reported getting about a week's relief from trigger-point injections by Ormiston.  AR-909.  With respect to his exam of Huberty, Dennison noted that Huberty was "alert and oriented. . . .  He has tenderness over his face.  Neck is supple.  He has tenderness over the neck and cervical spine."  *Id.* Dennison referred Huberty to a pain-clinic doctor for consideration of trigger-point injections.  *Id.*

Standard forwarded these notes to Dickerman for his review.  Dickerman opined, as he had in the past, that Huberty was not disabled.  In a report dated December 17, 2003, Dickerman commented:

> As has been the case previously, Dr. Den[n]ison continues to act
> and has taken this patient off work on the basis of subjective
> complaints, with no indication of an objective change in the
> patient's chronic pain syndrome and upper extremity numbness
> complaints that date over many years' time, status post surgical

- 33 -

> decompression.  In fact, those symptoms preceded the
> decompression and were not changed by the decompression.
> These records do not provide a reason to change his work status,
> being taken off work solely on the basis of the subjective
> complaints in the absence of findings. . . .
>
> In summary, the patient's current condition is unchanged from the
> previous condition . . . .  There is no indication of any change in
> the patient's exam to warrant a change in his work status.  Based
> on these more recent examinations, he has always been capable of
> continuing to perform full-time work activities in a sedentary
> capacity.

AR-927.

After Dickerman prepared this report but before Standard informed Huberty of any

decision based on the report, Dennison wrote a letter to Standard, dated January 12, 2004, in

which Dennison summarized Huberty's medical history and assessed his current condition.  AR-

951 to -952.  Dennison described in detail Huberty's neck surgeries.  AR-952.  Dennison also

said that Huberty had undergone bilateral carpal-tunnel release surgery in May 2001, after his

fusion surgery, but that the carpal-tunnel surgery had not relieved his hand pain.  *Id.*  Dennison

said that Huberty then went to the United Pain Center "for evaluation of chronic pain."  *Id.*

Dennison listed the many medications that Huberty had taken in the past and was taking at that

time.[45]  Dennison confirmed that Huberty was then being seen by a neurologist, Ormiston, for

"chronic neck pain, chronic hand and feet pain," and by another pain clinic "to deal with his

chronic pain of neck, hand, and feet."  AR-951.

Dennison summed up his findings and conclusions this way:

---

[45]The list of past medications included "anti-seizure medicines including Neurontin and
Topamax, antidepressants, chronic pain medicine including chronic narcotics, muscle relaxers
and anti-inflammatories."  AR-952.  The list of current medications included "Ritalin,
Neurontin, Mirapex, Topamax, Lexapro, Tagamet, aspirin, Allegra, Nasonex, quinine and
amitriptyline."  AR-951.

These symptoms are quite significant and quite debilitating for the patient. He has difficulty with chronic neck pain due to his condition. He states that any head motion and concentrated reading will aggravate the pain. He cannot even wear a winter coat in Minnesota without aggravation of the pressure of the coat against the neck causing pain. He is currently using a TENS stimulation unit[46] to try to reduce some of the pain in his neck and arms and hands as well as his feet. He has tried trigger-point injections and he has been very compliant with all of the recommendations.

I do not feel that he is able to work because of the significant disability and pain that has occurred. He also has a chronic problem with a sleep disorder with sleep apnea[47] and restless leg syndrome. This causes excessive daytime sleepiness. He is on nasal CPAP,[48] but cannot tolerate the mask because it increases his neck pain. He has been started on a stimulant medication to help reduce his daytime sleepiness. This has been unhelpful in reducing the problem. All these interventions have really not improved his baseline functioning. I do not feel that he would be able to continue in gainful employment because of the

---

[46]Transcutaneous electrical nerve stimulation or "TENS" is a treatment for chronic back pain that "involves wearing a small box over the painful area that directs mild electrical impulses to nerves there. The theory is that stimulating the nervous system can modify the perception of pain. Early studies of TENS suggested it could elevate the levels of endorphins, the body's natural pain-numbing chemicals, in the spinal fluid. *But subsequent studies of its effectiveness against pain have produced mixed results.*" Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, U.S. Dep't of Health & Human Servs., *Handout on Health: Back Pain* 21 (2005), http://www.niams.nih.gov/Health_Info/Back_Pain/back_pain_hoh.pdf.

[47]"Sleep apnea is a common disorder that can be serious. In sleep apnea, your breathing stops or gets very shallow. . . . When your sleep is interrupted throughout the night, you can be drowsy during the day. People with sleep apnea are at higher risk for car crashes, work-related accidents and other medical problems." U.S. Nat'l Library of Medicine & NIH, Medline Plus — Health Topics, "Sleep Apnea," http://www.nlm.nih.gov/medlineplus/sleepapnea.html (last visited Feb. 6, 2008).

[48]A "continuous positive airway pressure" or "CPAP" mask "delivers slightly pressurized air throughout the breathing cycle. This makes it easier to breathe." It is used to treat sleep apnea, among other things. U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Nasal CPAP," http://www.nlm.nih.gov/medlineplus/ency/article/001916.htm (last visited Feb. 6, 2008).

combination of chronic pain, excessive daytime sleepiness and his
ability [*sic*] to concentrate because of his chronic medications.

AR-951.

In late January 2004, Standard received treatment records from a psychiatrist, Craig

Vine, M.D., who saw Huberty from April to October 2003.  AR-953 to -964.  At Huberty's

intake visit in April, Vine diagnosed him with a type of major depressive disorder (ICD9-CM

296.23) and a breathing-related sleep disorder (ICD9-CM 780.59).  AR-963.  Vine increased

Huberty's Zoloft dosage and recommended considering other medication changes.  *Id.*

At Huberty's next visit, in June 2003, Huberty told Vine that he was frustrated and his

pain was "terrible."  AR-956.  Huberty reported that Neurontin helped with his pain but that his

sleep was poor.  *Id.*  Vine recommended continuing the Zoloft and adding Wellbutrin, another

antidepressant.  *Id.*

In July, Huberty reported that his hands and feet hurt more and that a new medication

prescribed by Ormiston, Provigil,[49] had not helped his energy.  AR-955.  The Wellbutrin had

also not helped, and Vine recommended increasing it.  Vine recorded Huberty's chief complaint

as "depressed/pain."  *Id.*

At the next visit, in August, Vine decided to discontinue Wellbutrin and add Lexapro.

AR-954.  Huberty's next and last documented visit was in early October.  AR-953.  Vine noted

that Huberty was "depressed, anxious, irritable, frustrated."  *Id.*  Huberty reported having

received an injection that temporarily helped his neck pain but not his hand or foot pain.  *Id.*

_____

[49]Provigil is a brand name of modafinil, a drug used to treat excessive daytime sleepiness.
U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Modafinil,"
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602016.html (last visited Feb. 6,
2008).

Vine's chart note says "No antidepressant?" and "Add Lexapro," which suggests that Huberty

may not have filled his prescription after the August visit.  *Id.*

On January 13, 2004, Standard informed Huberty that it would continue to evaluate his

claim in light of the January 12 letter from Dennison and other new information that Huberty

might submit.  AR-970.  Standard asked a consulting psychiatrist, Esther Gwinnell, M.D., to

review the records of Huberty's treatment by Vine.  *See* AR-1020 to -1021.  Gwinnell did not

review any other records.  She concluded:

> [Huberty's] depression does appear, at times, to be quite
> significant, but the normal mental status exam functions of
> concentration, focus, motor activity, and the relatively infrequent
> visits is more supportive of a depression which is perhaps
> significant, but not to the point of prevent[ing] Mr. Huberty from
> functioning in some occupation for which he is physically capable.
> The presence of depression, per se, does not in and of itself prevent
> an individual from functioning in their occupation.  Rather, one
> would be observing difficulties with memory, judgment, thought
> processes, attention, and concentration, and I am not seeing those
> as problem areas in Dr. Vine's notes.  Therefore, this information
> does not support limitations and restrictions from a psychiatric
> perspective.

AR-1020 to -1021.

On January 20, 2004, Standard informed Huberty that it would require him to attend an

independent medical examination ("IME").  AR-981 to -982.  In late February, Standard's claim

analyst told Huberty "that we were having unforeseen difficulty arranging an IME in his area,

that we were having trouble finding a qualified doctor."  AR-1152.  The IME eventually took

place on March 19, 2004, in Chicago, and was conducted by a neurosurgeon, Marshall I. Matz,

M.D.  AR-1421 to -1432.

- 37 -

Between January 13 and the IME on March 19, Huberty provided more medical records to Standard.  Those records, which dated back to 2001, contained the following additional information:

In January 2001, Huberty saw David Walk, M.D., a neuromuscular neurologist at the University of Minnesota, to whom Hyser referred Huberty for a second opinion.  AR-1290. Walk "did not have a clear etiology for Huberty's painful symptoms" but recommended an MRI scan to check for multiple sclerosis.  *Id.*  As noted above, that scan (done on January 19) did suggest a possibility of multiple sclerosis, which was ruled out by a subsequent lumbar puncture and lab results.  AR-1057 to -1058; AR-1067 to -1071; AR-1295.

In late February 2001, Hyser studied Huberty' eyes and found no evidence of any neurological problems in them.  AR-1293.  Also in late February 2001, Huberty visited Moore, the psychologist, for a second time.  AR-1130 to -1131.  On this second visit, Moore indicated that Huberty was "not in an emotional state at this time to discuss plans for therapy."  AR-1131.

In March 2001, Hyser summarized his recent findings for Dennison.  AR-1294 to -1295. Hyser reported that lab tests showed no evidence of multiple sclerosis.  AR-1295.  As for his physical-exam findings, Hyser described Huberty as having normal strength but commented that he "does tend to have a ratchety component with manual muscle testing"[50] and that "[s]ensory examination is notable for depression of vibratory and position sense in the feet."[51]  *Id.*  Hyser recommended a follow-up MRI scan in three months.  *Id.*

---

[50]This echoes Hess's finding of "cogwheel rigidity" in October 2000.  *See* AR-520 to -521.

[51]This echoes Shanbhag's physical-exam findings in March 2000.  AR-317 to -321.

As noted above, Huberty underwent cervical fusion surgery by Hartleben on April 30, 2001.  Hartleben's notes from follow-up visits show that Huberty gradually recovered from the surgery over the rest of 2001.  As of July 2001, Hartleben found Huberty to be "totally disabled" but noted that Huberty was "recovering well" and would likely be able to work part time in September 2001 and to eventually work full time.  AR-1107 to -1108.  In late September 2001, Hartleben filled out a "work ability" form indicating that, through November 6, 2001, Huberty could work light duty four hours per day as long as he wore a brace.  AR-1102.  On November 6, Hartleben indicated that Huberty could work light duty four to six hours per day for the next two to three months and only needed to wear a brace as needed.  AR-1101.  On January 16, 2002, Hartleben lifted almost all restrictions and indicated that Huberty could do light duty work for between four and eight hours per day for the next three months.  In late April 2002, Hartleben again concluded that Huberty could work light duty for between four and eight hours per day.  AR-1100.

Meanwhile, in August 2001, Hyser told Dennison that the follow-up MRI scan that he had recommended in March had been normal.  AR-1298.  Hyser commented that the fusion surgery seemed to have helped, and concluded, "I do not think any further neurologic evaluation is necessary."  *Id.*

Dennison's chart note from a December 2001 visit is consistent with this picture of gradual post-surgery improvement.  AR-1041.  Dennison noted that Huberty was doing well, and was off of narcotics (though he was still on Neurontin).  *Id.*

Records indicate, however, that in April and May 2002, Huberty's pain symptoms and his sleep problems began bothering him again.  On April 4, 2002, Huberty saw Dennison and reported problems sleeping and an "increase in neuropathy symptoms . . . ."  AR-1042.

- 39 -

Dennison referred Huberty to a pulmonary clinic to be evaluated for sleep apnea.  *Id.*  Because

Huberty was scheduled to see Hartleben in a few weeks, Dennison deferred consideration of

"further neurologic evaluation" until after that visit.  *Id.*

Huberty did undergo further neurological evaluation.  He again saw Hyser, who reported

his findings to Dennison in a letter dated May 23, 2002.  AR-1299 to -1300.  Hyser noted that

Huberty's symptoms were similar to his symptoms in October 1999, and commented, "[h]is

examination is virtually unchanged from then."  AR-1300.  Hyser found that "everything looked

stable" and that "[t]here is no indication that he has developed a progressive neurologic deficit."

*Id.*  Hyser left the follow-up open.  *Id.*

Huberty did not immediately follow up with Hyser or Dennison.  In early August 2002,

Huberty did follow up with Hartleben, who reviewed a CT scan of Huberty's cervical spine that

had been taken a few weeks earlier.  AR-1123 to -1124.  Hartleben commented:

> First, it appears that he has a solid arthrodesis [i.e., fusion] C3-T1.
> Transitional level discs show early degenerative change, but
> symptoms generated do not warrant further workup or treatment.
> Second, history of my[el]opathic symptoms appears to be stable
> and without serious findings on objective exam.  I recommend no
> further evaluation for this.  Third, I think the numbness in the
> hands is related to carpal tunnel syndrome, and I encourage
> [Huberty] to consider up-to-date EMG and proposed treatment by
> Dr. Hyser.

*Id.*

Later that August, Hyser reported to Dennison the results of a recent EMG, which

disclosed "[m]oderately severe bilateral carpal tunnel syndrome."  AR-1301.  Huberty's previous

EMG, from December 2000, had shown only mild carpal-tunnel syndrome, and Hyser noted that

the electrical changes had progressed since then.  *Id.*  The EMG also disclosed "[c]hronic

neurogenic changes" in the left biceps muscle, but this finding was unchanged from the

December 2000 EMG.  *Id.*  Hyser recommended that Huberty see a hand surgeon about carpal-tunnel surgery.  AR-1305.

It appears that the carpal-tunnel surgery was done sometime in October 2002, but records from that surgery are not in the administrative record.  At a pre-surgery physical, however, Dennison noted that Huberty was experiencing continued restless-leg issues and numbness in both hands and forearms.  AR-1045.  Dennison proposed to follow up after the carpal-tunnel surgery.  *Id.*

In January 2003, Dennison saw Huberty again.  AR-1045 to -1046.  Dennison noted that Huberty was experiencing side effects from Neurontin, trouble sleeping at night, and trouble staying awake during the day.  AR-1046.  Dennison referred Huberty to a pulmonary specialist for evaluation of his sleep issues.  AR-1045.

On February 6, 2003, Huberty was seen for the first time at a sleep center.  AR-1190 to -1192.  Chart notes from this visit indicate that Huberty complained of restless-leg syndrome that "seems quite severe"; possible sleep apnea; "chronic paresthesias in his extremities related to cervical disc disease"; and depression.  AR-1192.  Huberty was prescribed Mirapex at this visit. *Id.*

On February 11, Huberty was studied during an overnight stay at the sleep center.  AR-1179 to -1187.  The study showed that Huberty's "sleep disordered breathing was severe."  AR-1180.  The clinician who saw Huberty recommended treatment with a continuous positive airway pressure (or "CPAP") mask,[52] and commented that although no leg movements were noted, Huberty's Mirapex should be adjusted.  *Id.*

---

[52]As noted above, a CPAP mask relieves sleep apnea by delivering slightly pressurized air to the wearer, which makes it easier for him to breathe.

From February through August 2003, Huberty regularly communicated with the sleep center about his progress.  AR-1193 to -1202.  Huberty found it difficult to wear the CPAP mask and returned a number of times to be refitted.  In particular, Huberty complained that the mask aggravated his neck pain.  AR-1194.  Throughout this period, Huberty was also working with Dennison and Hyser to adjust his medications:  He was experiencing side effects from Neurontin, and his Mirapex dosage was frequently readjusted  AR-1046; AR-1305; AR-1047; AR-1197.

In late July 2003, Huberty again saw Dennison about his pain, depression, and sleep problems.  AR-1048.  Dennison noted:

> [Huberty] continues to have significant neck pain.  He continues to have pain that goes into his hands, a burning sensation in his hands and feet secondary to cervical myelopathy. . . . [H]e continues to be significantly depressed. . . . [H]e continues having pain in both hands despite the carpal tunnel surgery.  He has a history of sleep apnea which is being treated with a machine, which is not working well.

*Id.*  Dennison remarked that Huberty was "considering disability, as he is just not able to keep up with work with his current problems."  *Id.*  Dennison referred Huberty to Ormiston for a second neurological opinion.  *Id.*

Ormiston saw Huberty on July 25, 2003.  AR-999; AR-1002.  Ormiston found no neurological problems, but the physical exam showed "significant tenderness on palpation of the paracervical spine muscles."  AR-999.  A few weeks later, on September 4, Ormiston observed that Huberty was

> no better and he just seems worse gradually. . . . The patient continues to have seemingly, gradually worsening neck pain that has not been amenable to any intervention. . . .  He asked me about disability and my sense is that he should apply for disability, given the circumstances.  He has had enough surgeries that no one is

- 42 -

> going to want to do surgery, and the odds of success fall.  The way
> he looks it doesn't look as if he could manage at work.  If there is a
> question about that we could do a functional capacity evaluation.

AR-1004.  Ormiston ordered a CT scan that was conducted a few weeks later.  *Id.*

In August 2003, Huberty saw Hartleben for an annual followup with respect to his neck

surgeries.  AR-1125 to -1127.  After noting Huberty's complaints of sleep difficulties,

depression, and ongoing pain, Hartleben commented that Huberty was off of narcotics.  AR-

1127.  Huberty's neurological exam was normal, and his physical exam showed only

"nonspecific mild tenderness."  AR-1126.  Hartleben said:

> Certainly, some of the dysesthesias in [Huberty's] hands and legs
> can be assigned to unresolved myelopathy but he has no serious
> objective neurologic findings on exam to verify this.  Axial neck
> pain, as he describes, is very common with very long fusion
> constructs.  I see no evidence of instability or osteoarthritis that
> would command further workup or specific treatment.

*Id.*  In response to a question from Huberty about whether Hartleben considered him totally

disabled, Hartleben said:

> When looking specifically at his neck and his residual myelopathy
> I would consider him restricted to sedentary-to-light duty full-time
> work.  Certainly, when adding more significant obstructive sleep
> apnea and significant depression the combination of these issues
> could certainly disable him but I am sending him to his primary
> physician to collect all that data and read it and render an opinion
> in that respect.

AR-1125.

Next, in a letter dated September 30, 2003, Ormiston told Denniston that a CT scan

showed a solid fusion of Huberty's cervical vertebrae.  AR-1005.  Ormiston commented:

"[Huberty's] pain is localized to the back of the neck, superficial to the spine and to the joints, I

believe.  Perhaps this pain is more musculoskeletal than we have considered.  I can find a lot of palpable tenderness . . . ."  *Id.*

In late October 2003, Ormiston saw Huberty again.  AR-1000 to -1001.  Ormiston told Dennison that he was unable to identify any spinal-cord injury that would explain Huberty's symptoms, and Huberty's physical exam did not show any evidence of myelopathy.  *Id.* Ormiston described Huberty's condition as one of "these severe polyneuropathies" and prescribed amitriptyline for pain and to help Huberty sleep, as well as Ritalin to combat Huberty's daytime sleepiness.  AR-1001.

In late November 2003, Huberty saw L. Michael Espeland, M.D., at a new pain clinic. AR-1213 to -1214.  Notes from that visit indicate that Huberty's physical exam was generally normal but that "[r]ange of motion of the [cervical spine] [was] limited due to pain."  AR-1213. Espeland prescribed Ultracet[53] and directed Huberty to return for trigger-point injections and possible electrical stimulation.  *Id.*  Huberty returned to the pain clinic on December 5, where he received trigger-point injections and was taught how to use the electrical-stimulation device at home.  AR-1215.  Espeland described Huberty as having "persisting and intractable myofascial pain . . . ."  *Id.*

---

[53]Ultracet is a brand name of the painkiller tramadol, formulated in combination with acetaminophen.  "Tramadol is used to relieve moderate to moderately severe pain."  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Tramadol," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html (last visited Feb. 6, 2008).

At Huberty's next visit, on January 9, 2004, Espeland prescribed Vicodin[54] and continued electrical stimulation.  AR-1216 to -1217.  Huberty reported being in constant pain, and Espeland again noted on physical exam that Huberty's range of motion in his cervical spine was limited by pain.  AR-1217.

Huberty also saw Dennison on January 9.  AR-1052.  Dennison noted (as had Espeland) that the range of motion of Huberty's neck was limited because of pain.  *Id.*  Dennison also noted that Huberty had "decreased pin sensation" in his hands and feet and "decreased vibratory sense" in his toes.  *Id.*  Dennison commented that Huberty "continues to be disabled from work due to his excessive neurologic symptoms, inability to sit for any period of time due to pain, inability to do significant walking, and excessive somnolence due to his sleep disorder."  *Id.*  In mid-January, Huberty saw Ormiston again about adjusting his medications.  AR-1016.

On March 9, 2004, Standard contacted Matz, the Chicago neurosurgeon that it had hired to conduct the IME.  AR-1222 to -1228.  Standard provided Matz almost no information about Huberty's job.  Instead, Standard asked Matz to "describe the claimant's capacities and limitation to perform their own occupation as a Computer Programmer," and attached a single page from a dictionary of occupational titles that defined different categories of work (sedentary, light, medium, heavy, and very heavy).  AR-1227; AR-1225.

---

[54]Vicodin is a brand name of hydrocodone, an opiate painkiller, formulated in combination with acetaminophen.  Vicodin, like tramadol, "is used to relieve moderate to moderately severe pain."  U.S. Nat'l Library of Medicine & NIH, Medline Plus — Drugs & Supplements, "Acetaminophen and Hydrocodone," http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html (last visited Feb. 6, 2008)

Matz examined Huberty in Chicago on March 19, 2004, and Standard received the final draft of his report on May 10.  AR-1438 to -49.  Matz's report is twelve pages long.  After summarizing and commenting on Huberty's medical records and history, Matz concluded:

> [I]t is this writer's opinion that Stephen Huberty's complaints are not reflective of any type of abnormality involving the spinal cord, nerve roots or peripheral neurologic structures.  The incongruities in his complaints, the nonanatomic distribution of his alleged symptoms, the lack of confirmatory findings with regard to a presumptive diagnosis of cervical myelopathy lead to the conclusion that there was no objective evidence to support the contention that Mr. Huberty would be benefited by one or more operative procedures on the cervical spine and a bilateral carpal tunnel decompression.  His profound complaints of physical incapacity are simply not confirmed by his objective neuromuscular examinations or for that matter by the imaging studies.  The lack of objective findings would not indicate from a neurologic standpoint that Mr. Huberty's claim of physical incapacity is the result of any disease process involving the nervous system.  A number of psychological or psychiatric issues have evolved and I would simply refer you to those records and not offer any opinion outside of my area of neurosurgery.  I would point out, however, that it is not infrequent that we see individuals such as Mr. Huberty seeking surgical intervention and being provided with same present with typical characteristics of depression, anxiety, drug abuse, and claims of disability.  Clearly, Mr. Huberty has issues regarding his morbid obesity and sleep apnea, but it is my understanding that that is not the major component of his current alleged disability.  Mr. Huberty is at maximum medical improvement from a physical perspective and not in need of any other diagnostic or therapeutic efforts.

AR-1438 to AR-1439.

In reaching this conclusion, Matz specifically criticized the diagnosis given by Hartleben, who conducted the fusion surgery in May 2001.  Matz commented:

> Dr. Paul Hartleben was of the opinion that Mr. Huberty's complaints were related to mechanical neck pain and recommended discography at four levels.  I would point out by way of comment that terms such as "mechanical pain" refer to no specific anatomic abnormality and are usually applied to

- 46 -

individuals with nonorganic pain complaints and with imaging studies no different then imaging studies taken of individuals who are asymptomatic.  Dr. Hartleben, however, was of the persuasion to do further surgery on Mr. Huberty's cervical spine doing an anterior approach that came apart and then proceeding to do a posterior decompression with results that clearly should have been anticipated from a preoperative assessment.  It has been my experience in situations such as this that surgery from either an anterior or posterior approach or both will not resolve bizarre neuromuscular complaints and findings, will not alter giveaway weakness, will not change complaints of a nondermatomal sensory nature, nor will it relieve incomprehensible pain symptoms as described by Mr. Huberty.  It has also been shown in the medical literature that individuals with psychosocial problems tend to have so-called "positive discography" as was said to be present at the C4, C5 and C6 levels.  In addition, he had nonconcordant complaints at C3, although that disc looked normal on MRI.  Mr. Huberty was described as strongly interested in pursuing surgical intervention, also not an atypical sign for such individuals.  Further review of the medical records in my opinion raise[s] issues as to drug seeking behavior, as well as drug dependency.

AR-1441 to -1442.

Based largely on Matz's assessment, in a letter dated May 25, 2004, Standard again upheld its termination of Huberty's short-term disability benefits as of November 30, 2003.  AR-1473 to -1480.  Between March and May 2004, however, Huberty provided some more records to Standard, and Standard hired an investigator to conduct surveillance of Huberty.

Among the records that Huberty provided to Standard in March or April 2004 were additional chart notes from Huberty's pain-clinic visits in 2001.  At a visit in July 2001, the doctor noted that Huberty had come in to taper off of his Neurontin, was tapering off of OxyContin, and planned to taper off of Vicodin.  AR-1310 to -1311.  In mid-October 2001, Huberty returned to the clinic and saw Kioski, whose notes show that Huberty was then back at work, was off of narcotics, but was still taking Neurontin for his pain.  AR-1312 to -1313.  At a mid-December 2001 follow-up visit, Kioski noted that Huberty was working four to six hours a

day, and Huberty told Kioski that he could "tolerate this level of pain and deal with it as it flares." AR-1315. Huberty told Kioski that he was not interested in being on narcotics again. *Id.*

Standard also learned in April 2004 that Huberty's claim for Social Security disability benefits was approved. AR-1411 to -1413. The Social Security Administration found that he was entitled to benefits as of March 2004. AR-1413.

Investigators hired by Standard conducted surveillance of Huberty from March 20 through March 27, for a total of 50.5 hours. AR-1391 to -1409. An investigator also interviewed Huberty in person on April 6, 2004. AR-1370 to -1387. Standard never relied on or referred to the results of this surveillance in upholding its decision to terminate Huberty's benefits.

As noted above, in a letter dated May 25, 2004, Standard upheld its decision to terminate Huberty's short-term disability benefits on November 30, 2003. Standard reiterated Dickerman's December 2003 conclusion that the evidence that Dennison provided to support Huberty's claim — an ortho/neuro questionnaire and chart notes — did not show that Huberty was unable to work, because Dennison "recommended cessation of work solely on the basis of subjective complaints and in the absence of findings." AR-1478. Elsewhere in the letter, Standard characterized Dennison's recommendation as having been "based on subjective complaints, not actual objective neurological evidence." AR-1474.

With respect to the effect of Huberty's depression on his ability to work, Standard said that its consulting psychiatrist found that Huberty's "depressive symptoms were not of such a severity to preclude you from functioning in an occupation for which you are physically

capable." *Id.* Standard also reiterated Matz's conclusion that obesity and sleep apnea "are not

the major component of the current alleged disability." *Id.*

In July 2004, Standard asked an internal-medicine doctor, Janette Green, M.D., to review

Huberty's file. AR-1484 to -1488. Green concluded that "[t]he documentation does not support

limitations or restrictions that would preclude [Huberty] from performing the duties of a

sedentary level occupation." AR-1484 to -1485. With respect to depression, Green agreed with

Gwinnell's earlier conclusion that this did not prevent Huberty from working. AR-1485. With

respect to medications, Green commented that "there is no documentation that [Huberty] is

having any significant side-effects to any of his medications." *Id.* And with respect to

Huberty's sleep apnea and daytime sleepiness, Green said that the available documentation

"does not indicate that either the claimant's sleep apnea, or questionable daytime

hypersomnolence, is of a severity to preclude a sedentary occupation." AR-1485.

Also in July 2004, Huberty retained Richard A. Williams, Jr. (counsel in this case). Over

the next several months, Williams communicated regularly with Standard. Williams asked

Standard to provide various information, challenged the merits of Standard's decision on

Huberty's claim, and asked Standard to reconsider its decision. In particular, Williams argued

that Standard had not used a proper definition of Huberty's job and had not adequately

considered the job's cognitive demands. *See* AR-1504 to -1515.

In a letter dated December 22, 2004, Standard again upheld its decision to terminate

Huberty's benefits. AR-1533 to -1537. With respect to Huberty's cognitive ability to do his job,

Standard concluded that "there is not sufficient documentation in the file to support that

Mr. Huberty was cognitively impaired based on complaints of pain, depression, sleep apnea, or a

physical condition." AR-1535. Standard disavowed ever having relied, in making its benefits

decision, on Matz's suggestion in the IME that Huberty had a drug problem (although Standard had paraphrased Matz's comments on the subject in its May 25, 2004 letter). *Id.* Standard also said that despite Huberty's history of back and hand surgery between September 2000 (when he returned to full-time work after his first surgery) and September 2003 (when he stopped working), there was "not sufficient documentation in the file to support that there was a change in Mr. Huberty's physical condition to warrant a change in his work status." AR-1536. And Standard repeated Matz's conclusion that Huberty's symptoms did not reflect any neuorological illness or injury. *Id.*

In late January 2005, Standard asked another consulting psychiatrist to review Huberty's file. AR-1553. Standard asked two questions: First, did the consultant agree with Gwinnell's earlier assessment that Huberty was not disabled by depression? Second, did the "weight of the medical evidence" support the conclusion that Huberty's "depression and widespread body pain" so severely impaired his concentration and cognitive abilities that he could not do "complex project management"? *Id.*

The consultant, psychiatrist Cheryn Grant, D.O., concluded in a report dated January 28, 2005 that Huberty was not disabled. AR-1554 to -1558. With respect to Standard's first question, Grant agreed with Gwinnell that Huberty's depression was not disabling. Grant said that Huberty had been depressed since 1999, but "[t]hroughout that time, he has been able to function and to perform at his work related tasks." AR-1555. Grant pointed out that Huberty's mental-status exams were basically normal each time that he saw Vine in 2003, and further asserted that "other physicians who have seen him have also not noted any difficulties with his mental status examination or problems with his attention, focus and concentration that would impact his ability to perform work-related tasks of a sedentary nature." AR-1555. Grant's

conclusion with respect to Standard's second question was similar:  She said that "[t]he medical

evidence that we have at this point does not show any problems with Mr. Huberty's executive

functioning or his ability to attend and concentrate."  *Id.*  Grant discounted Huberty's subjective

complaints, saying that "[a]lthough there are multiple subjective physical complaints described,

the objective findings from the various physicians all indicate a normal mental status

examination."  AR-1556.

In a letter to Williams dated February 15, 2005, Standard again upheld its decision to

terminate Huberty's benefits.  AR-1560 to AR-1564.   Standard said that Huberty's claim was

based on "subjective complaints" and not sufficiently supported by objective findings.  AR-

1561.  Standard noted that Huberty was able to work from 2001 to 2003 despite "subjective

complaints" in 2001 that were similar to his complaints in September 2003.  *Id.*  Standard denied

that Huberty's pain was disabling:

> With regard to Mr. Huberty's complaints of widespread body pain,
> we must rely on the written medical evidence to document
> impairment, and such medical evidence must support a level of
> impairment that would normally preclude someone from
> performing their regular duties.  We must rely on the medical
> evidence as a whole to serve as an indicator of the severity of a
> condition.  We understand that Mr. Huberty has complained that
> the pain he experiences prevents him from working in his own
> occupation.  However, even moderate degrees of pain are not, in
> and of themselves, incompatible with the performance of certain
> levels of sustained work activity.  Mr. Huberty has undergone
> several surgical procedures to alleviate his pain, but on a physical
> basis, his own treating orthopedist has indicated that Mr. Huberty
> should be able to perform full time sedentary and light level work.

AR-1561.  Standard summed up its conclusion by saying:  "We found insufficient written

evidence or test results which compellingly document [Huberty] was significantly impaired from

any Physical Disease, Injury, or Mental Disorder, alone or in combination, beyond the date his claim closed." *Id.*

Williams responded by again asserting that Standard was not using the correct job description in assessing Huberty's disability. AR-1570. A vocational case manager at Standard reviewed Huberty's curriculum vitae and agreed with Williams. AR-1586 to -1592. The case manager determined that Huberty was not a "programmer-analyst" — the job description Standard had been using since December 2004 — but rather a "project director" in charge of projects that involved "highly complex technological development and decision-making." AR-1592.

In light of this determination, Standard asked Grant to reassess Huberty's claim that he was disabled because of a "mental inability" to do his job. AR-1595. Standard told Grant that Huberty's job "may have required highly technical and complex project and planning skills" and asked whether he was capable of full-time work after November 30, 2003. *Id.*

In response, in March 2005 Grant reiterated her earlier finding that the medical records showed normal mental-status examinations and included "no reports of difficulties with attention, focus, or concentration . . . ." AR-1597. She commented that Huberty was "apparently doing this work [i.e., complex work] through the time that he ceased work." *Id.* Grant concluded, "there is nothing additional in the new job description or the change in job title from program analyst to project manager that would indicate that Mr. Huberty is limited and restricted from performing the tasks of a project manager. That is his occupation." AR-1596.

Standard upheld its decision to cut off Huberty's benefits for the final time in a letter dated April 15, 2005. AR-1602 to -1604. Standard noted that it had asked a consulting psychiatrist to consider Huberty's claim that he was disabled by "cognitive deficits due to pain

and depression" in light of Standard's recent conclusion that he was a "project manager."  AR-1603.  Standard upheld its termination of benefits because, based on that psychiatrist's review, there was "insufficient documentation that Mr. Huberty was suffering from any mental deficits due to anxiety, depression, sleep apnea, or pain, that would negatively impact his ability" to do his job as of November 30, 2003, when his claim was closed.  *Id.*

Huberty then brought this action.

## II.  ANALYSIS

### A.  *Standard of Review*

Huberty challenges Standard's decisions as an ERISA plan administrator on his two claims for disability benefits.  The parties cross-move for summary judgment.  Accordingly, two interlocking standards of review apply in this case:  the general summary-judgment standard and the specific standard that applies to federal-court review of decisions by ERISA plan administrators.

#### 1.  Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the

non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

## 2.  ERISA

The parties agree that the insurance policies in this case grant Standard significant discretion in interpreting the policies and making benefits decisions.  Def. SJ Mem. at 18; Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 7-8 [Docket No. 30].  Presumptively, then, the Court reviews Standard's decisions for abuse of discretion.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

With respect to questions of policy interpretation, an ERISA plan administrator's interpretation will be upheld on review for abuse of discretion if the interpretation is "reasonable" under the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992).  The *Finley* factors are:  (1) whether the fiduciary's interpretation is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the fiduciary has consistently followed the interpretation.  *Id.* at 621.  The Eighth Circuit has directed district courts to examine all five *Finley* factors.  *Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 584 (8th Cir. 1995).

With respect to questions of policy application — i.e., questions that depend on factual conclusions — the abuse-of-discretion standard likewise requires the Court to review for reasonableness.  Such review, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).  Rather, an

ERISA plan administrator's decision must "be supported by substantial evidence that is assessed by its quantity and quality." *Id.*

Huberty, however, contends that Standard's decisions should be subject to less deferential review for a number of reasons. With respect to both claims, Huberty contends that Standard used the wrong job description and the wrong definition of disability and that this was a serious procedural irregularity warranting less deferential review. Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 3-4, 12 [Docket No. 35]. With respect to his 2003 claim for benefits, Huberty makes two further arguments. First, he points out that Standard was both the administrator and the payor for that claim and therefore suffered a conflict of interest. Pl. SJ Opp. at 13; Pl. SJ Mem. at 6-7. Second, Huberty argues that by refusing to provide certain information requested by Huberty's lawyer, Standard committed a serious procedural irregularity. Pl. SJ Opp. at 13-14; Pl. SJ Mem. at 17-18.

The Court disagrees with Huberty's various arguments and finds that Standard's two decisions to terminate his benefits are subject to abuse-of-discretion review. Under *Woo v. Deluxe Corp.,* a heightened standard of review applies only if there is "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty . . . ." 144 F.3d 1157, 1160 (8th Cir. 1998). Huberty cannot satisfy this test.

The Eighth Circuit has held that a palpable conflict of interest arises when an ERISA administrator is also a payor. *See Torres*, 405 F.3d at 678. But that conflict of interest alone does not lead to less-deferential review; rather, that conflict of interest must be shown to have some connection to the particular benefits decision being reviewed. *See id.* at 679-80 (declining to adopt a less-deferential standard of review where the ERISA administrator was also the payor

because the claimant "has not shown that [the administrator's] financial conflict of interest had a sufficient connection to the decision").  Huberty has not shown any such connection in this case.

Huberty's allegations of procedural irregularities also do not mandate less-deferential review.  As an initial matter, the Court doubts whether using the wrong job definition or definition of disability is a "procedural irregularity."  Such definitions are essential elements in determining the eligibility of any claimant for benefits; using the wrong definitions is therefore not so much a procedural irregularity as it is a substantive error (which might lead to an unreasonable decision, i.e., an abuse of discretion).  *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006) ("When we speak of 'procedural irregularity' in this context, therefore, we refer to the sorts of *external factors* that are sufficient under the common law of trusts to call for application of a less deferential standard of review.") (emphasis added).

In any case, however, Standard's decisions were not affected by its use of an incorrect job definition or definition of disability.  It is true, with respect to Huberty's first claim, that Standard considered only Huberty's ability to do sedentary work, and not his ability to do his job in particular.  But Standard concluded that Huberty was physically and mentally capable of doing *any* sedentary job, which necessarily included his own.  And with respect to Huberty's second claim, Standard's ultimate decision was in fact based on a consideration of his ability to do his particular job.

The Court also rejects Huberty's argument that Standard, by refusing to comply with an extremely broad request for information that bore no relationship to Huberty's particular claim, committed a procedural irregularity.  Huberty has not provided any case law or other authority to support his contention that he was entitled to the information that his attorney demanded.

- 56 -

Moreover, Huberty cannot establish that Standard's failure to provide that information was in any way connected to either of its decisions on his two claims.

### B.  Benefits Claims

### 1.  Claim 1:  September 2000 Benefits Denial

In finding Huberty ineligible for long-term disability benefits after September 2000, Standard relied primarily on Dickerman's unwavering opinion that Huberty was not disabled.[55] Standard also consulted with Hosack as to the effect of Huberty's medications.  Neither Dickerman nor Hosack talked to Huberty or to any of Huberty's treating physicians.  Nor (curiously) did Standard ask Huberty to undergo a functional-capacity evaluation, even though Hyser recommended such an evaluation.

The heart of Dickerman's opinion was his disagreement with Huberty's doctors as to the etiology of Huberty's symptoms.  Huberty's doctors first diagnosed him with cervical myelopathy, a diagnosis supported at the time by imaging studies that showed a spinal stenosis (which can cause myelopathy).  When Huberty's symptoms did not abate after surgery relieved his stenosis, his doctors diagnosed him with peripheral neuropathy or with ongoing myelopathy reflecting lasting damage done to his spinal cord by the since-relieved stenosis.  Later, Huberty's orthopedic surgeon diagnosed him with mechanical neck pain and, after a discography that the surgeon interpreted as confirming his diagnosis, the surgeon fused Huberty's cervical vertebrae.

Dickerman disagreed that either myelopathy or neuropathy was the cause of Huberty's symptoms.  Dickerman also apparently disagreed with the diagnosis of mechanical neck pain,

---

[55]Standard also asked Fancher's opinion.  Fancher's one-paragraph report was wholly conclusory, however, and amounted to little more than his statement that he agreed with Dickerman.  AR-737.  The Court therefore focuses on Standard's reliance on Dickerman's opinion.

since he said that the discography had provided no useful information.  AR-605.  Dickerman

emphasized that Huberty's neurological exams were basically normal — i.e., they showed "no

focal neurological deficits."  *Id.*  Thus, Dickerman concluded that Huberty had no underlying

neurological disease.  Dickerman further reasoned that because Huberty had no neurological

disease, he was not disabled.  *See, e.g.,* AR-547.

Diagnosis and disability, however, are separate issues.  Indeed, Standard relied on this

very distinction when it upheld its denial of benefits despite evidence that Huberty might have

multiple sclerosis.  Standard pointed out that a diagnosis is not a disability and concluded that

regardless of whether Huberty had multiple sclerosis, Standard did not believe that he had

demonstrated that he was disabled.  AR-620.  But just as a diagnosis alone is not a disability, the

*absence* of a diagnosis (or of a correct diagnosis) is not necessarily the absence of a disability.

Obviously, a medical condition — say, paralysis or blindness — could be disabling even if its

cause has not been correctly identified.

To determine whether Standard properly cut off Huberty's benefits in September 2000,

then, the Court must consider two questions:  (1) Does Standard's long-term disability policy

exclude coverage of conditions that, although actually disabling, are wrongly diagnosed?

(2) Did Huberty fail to establish that he was in fact disabled?  If the answer to either question is

"yes," then Standard's decision to terminate Huberty's benefits must be upheld.

### a.  Coverage of Wrongly Diagnosed Conditions

In its final letter upholding its termination of Huberty's benefits, Standard defended its

action on the basis that Huberty's neurological exams since his March 1999 surgery were all

normal.  AR-748.  This reflects Dickerman's conclusion that the "most relevant portion" of

Huberty's medical records is the fact that, despite his symptoms, "no focal neurological deficits" were noted in Huberty's most recent neurological exam.  AR-547.

As a factual matter, Dickerman's opinion as to the etiology of Huberty's symptoms is certainly reasonable.  Indeed, although many of Huberty's doctors initially diagnosed him with cervical myelopathy or polyneuropathy, over time various other, non-neurological disorders were identified as possible explanations for his symptoms.[56]

But whether the inaccuracy of Huberty's diagnosis, by itself, is enough to justify Standard in cutting off his benefits is a question of policy interpretation.  Standard implicitly construed its long-term disability policy to require objective evidence definitively establishing a particular *diagnosis* that explains a claimant's symptoms, regardless of those symptoms' reality or severity.  This is not a reasonable interpretation of the policy in light of the policy's proof-of-loss provision, its definition of "physical disease," its purpose of insuring against actual disability, and its coverage of mental disorders.[57]

---

[56]Hartleben, an orthopedic surgeon, diagnosed Huberty in December 2000 as having "severe mechanical neck pain."  AR-653.  At a follow-up visit in 2003, Hartleben noted that Huberty's symptoms might "be assigned to unresolved myelopathy but [Huberty] has no serious objective neurologic findings on exam to verify this."  AR-1126.  Selmo, a psychiatrist, proposed three diagnoses in 2003, one musculoskeletal, one psychiatric, and one possibly neurological.  AR-635 (in "impression" section of chart, listing "[m]echanical pain in the cervical spine with a secondary myofascial component"; "[a] pain disorder with both a psychological factor and a general medical condition"; and "[c]hronic pain syndrome").  And in September 2003, Ormiston, a neurologist, speculated that Huberty's condition might be "more musculoskeletal than we have considered."  AR-1005.

[57]In terms of the five *Finley* factors, these considerations relate to the first factor (whether the fiduciary's interpretation is contrary to the clear language of the plan), the third factor (whether the interpretation renders any language in the plan meaningless or internally inconsistent), and the fourth factor (whether the interpretation is consistent with the goals of the plan).  The record contains no evidence with respect to the fifth factor (whether Standard has consistently followed the plan interpretation).  But the second factor does not weigh against Standard's interpretation, which does not conflict with the substantive or procedural

The policy's proof-of-loss provision includes no objective-evidence requirement. True, the Eighth Circuit has held that an insurer may require some kind of objective evidence from an insured even in the absence of an express objective-evidence requirement in the governing ERISA plan. *See Pralutsky*, 435 F.3d at 838-39; *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813-14 (8th Cir. 2006); *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) ("It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence."). But that required objective evidence can include clinical observations and findings; it is not limited to things like x-rays and lab results. *See Johnson*, 437 F.3d at 814 (noting that the trigger-point test for fibromyalgia can be objective evidence of the disease).

In this case, clinical observations — that is, objective evidence of the type that can satisfy an implied objective-evidence requirement — established that Huberty's symptoms were real. Indeed, not a single doctor who examined him (other than Standard's consultant Matz) suggested that Huberty's symptoms may have been feigned. (One doctor, Selmo, thought in 2003 that the symptoms might be psychogenic, AR-635, but that is not the same as suspecting that the symptoms might be feigned.) Standard never disputed the reality of Huberty's symptoms.

But Standard went further and required Huberty to provide objective evidence not just that his pain and other symptoms *existed* — that they were *real* — but that his doctors had correctly identified their *source*. Diseases, however, can be puzzling, and on Standard's interpretation of the policy, a person suffering a baffling disease would have no disability coverage, even if objective evidence showed beyond doubt that he was disabled by the disease. Under this interpretation, the policy would cover those who were disabled by diseases that had

requirements of ERISA. *See Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992).

been correctly diagnosed (and thus were likely being treated properly), but would not cover those who were disabled by diseases that had not yet been correctly diagnosed (and thus were unlikely to be receiving effective treatment). In other words, under Standard's interpretation, its disability policy would not cover those who need disability coverage the most.

Suppose, for example, that an opera singer who is insured under Standard's policy comes down with a terrible cough that prevents her from singing and thus unquestionably disables her in her own occupation. Suppose further that the cough is objectively verifiable: She coughs all the time. Now suppose that the real cause of the cough is an unidentified lung cancer, but that her doctor diagnoses a viral infection and lists this as the diagnosis on her disability-insurance claim form. If objective evidence did not support the diagnosis of a viral infection, and lung cancer had not yet been diagnosed, could Standard deny her benefits notwithstanding her disabling cough just because her doctor made a mistake in identifying the cause of the cough? The Court thinks not, given the language and purpose of Standard's policy.

If (as Dickerman believed) Huberty's symptoms were not due to the disease that his doctors identified, then one of three things must have been true: (1) the symptoms arose from an as-yet-unidentified physical source; (2) the symptoms were psychogenic (i.e., subjectively real, but arising from no physical source);[58] or (3) the symptoms were feigned.

Standard's policy cannot reasonably be construed to exclude coverage for disabilities arising from an as-yet-identified physical source. Standard's policy covers disability arising from "physical disease," defined as "a physical disease entity or process that produces structural

---

[58]To the extent that every subjective experience correlates with some physical state of the brain, the distinction between "psychogenic" pain and "physical" pain is not entirely coherent. It is, however, a distinction that medical science (and the insurance industry) recognizes, at least for now.

or functional changes in your body as diagnosed by a Physician." AR-05. Several physicians in fact diagnosed Huberty as suffering a physical disease (myelopathy, or polyneuropathy, or mechanical neck pain and underlying degenerative disk disease) that produced a functional change (pain) in his body. Perhaps they were wrong. But Huberty was under the care of a physician, and physicians sometimes make mistakes. They also sometimes disagree in good faith over a diagnosis. Such mistakes or disagreements are not, in themselves, reasons to cut off benefits under Standard's policy to an insured who is actually disabled.

Tying a "physical disease" to a disease entity diagnosed by a physician, as the policy does, serves two purposes: It guards against fraud, and it minimizes the likelihood of unnecessary disability claims because a claimant under the care of a physician is likely to receive treatment to ameliorate his disabling condition. These two purposes are still served if a claimant who is *in fact* disabled by *some* medical condition remains eligible for benefits as long as a doctor diagnoses him with a disabling condition, even if that diagnosis later proves to be mistaken.

In this case, Huberty underwent surgery in 1999 based on a diagnosis of cervical myelopathy caused by spinal stenosis. By 2002, when Standard finally upheld its denial of his first claim for benefits, Standard knew that Huberty had undergone a second surgery based on a diagnosis of mechanical neck pain and underlying degenerative disk disease. Significantly, Hartleben — who made this diagnosis — found that Huberty did not have any "objective neurologic disease that [could] be attributed to his cervical spine." AR-653. In this, Hartleben agreed with Dickerman. But Hartleben believed that a subsequent discography confirmed his diagnosis of mechanical neck pain and that surgery was therefore justified, while Dickerman thought that the discography provided "no reasonable or useful information." AR-605.

Dickerman never directly challenged Hartleben's diagnosis, however; Dickerman simply affirmed repeatedly that Huberty had no neurological disease.

Given that Huberty was under the care of doctors who diagnosed him with physical diseases, it was unreasonable for Standard to deny him benefits just because Dickerman explicitly rejected some diagnoses (myelopathy and neuropathy) and implicitly rejected another (mechanical neck pain). At least as of September 2000, Huberty had a "physical disease" as the policy defined that term, and he had provided sufficient "objective evidence" of that disease given the policy's proof-of-loss provision.

Finally, the Court notes that even if Huberty's pain was partly psychogenic, Huberty still would have been entitled to coverage under the policy, although that coverage would have been limited to twenty-four months. *See* AR-12 ("Payment of [long-term disability] benefits is limited to 24 months for each period of continuous Disability caused or contributed to by a Mental Disorder."). Assuming, for the sake of argument, that Dickerman's opinions ruled out a neurological etiology for Huberty's symptoms, those opinions surely did not rule out a psychogenic etiology. And as of 2003, at least one of Huberty's doctors thought that his pain was partly psychogenic: Selmo diagnosed him with "[a] pain disorder with both a psychological factor and a general medical condition" (DSM-IV-TR/ICD9-CM 307.89). AR-635.

To be clear: The Court is not suggesting that Standard had some basis to treat Huberty's claim as one for mental disability. As the Court has described, Huberty provided objective evidence of a physical disease to support his first claim for benefits. The Court simply notes that it would run counter to the policy's coverage of mental disability to exclude coverage of subjectively real symptoms just because there was not enough objective evidence to establish a physical etiology for those symptoms.

### b.  Evidence of Actual Disability

Whether Huberty's diagnosis was right or wrong, and whether he had a physical disease or a mental disorder, he was not disabled unless his symptoms were both real and sufficiently severe to disable him.  As noted above, Standard is entitled to require objective evidence on both points.  But that objective evidence can take the form of clinical findings.  Indeed, evidence as to the severity of many symptoms (such as pain, nausea, and fatigue) can *only* be obtained through clinical observation or testing (such as a functional-capacity evaluation).

With respect to the reality of Huberty's symptoms, it is crucial to note that no one who treated Huberty seems to have thought that his symptoms were feigned.  Indeed, two surgeons considered Huberty's symptoms real enough to merit major surgery.  Moreover, numerous clinicians noted pain behaviors on physical exam or otherwise remarked that Huberty was obviously in pain.  In light of this clinical evidence and the fact that Huberty sought and received treatment for his symptoms over a long period of time, it would be an abuse of discretion to find, based on the administrative record, that Huberty was feigning his symptoms.

The key question, therefore, is whether Huberty provided sufficient objective evidence of the *severity* of his symptoms.  Dickerman disregarded what he called Huberty's "subjective pain complaints" because Huberty's neurological exam was normal.  AR-547.  In other words, Dickerman opined that Huberty's symptoms were not disabling because Huberty did not have a neurological disorder.  But this is a non sequitur:  Whether Huberty's symptoms were disabling is a separate question from whether they resulted from a neurological disorder.

The only evidence that Standard possessed regarding the severity of Huberty's symptoms, apart from his self-assessment and the opinions of his doctors, was evidence

regarding the number of hours that Huberty was working.  And both Hosack and Dickerman

relied heavily on Huberty's work hours in concluding that he was not impaired.

How much a person *does* work obviously provides some evidence of how much he *can*

work.  But in this case, it was the *only* evidence that Standard possessed — outside of evidence

that supported Huberty's claim — of Huberty's ability to work.  Given the terms of Standard's

long-term disability policy, Standard abused its discretion in determining that because Huberty

was working part time, he was equally capable of working full time.

Standard's long-term disability policy expressly permits part-time work:  A claimant is

considered partially disabled as long as he is unable to earn eighty percent of his pre-disability

earnings.  This feature of the policy becomes meaningless if a claimant's ability to work part

time is taken as conclusive evidence that he can work full time.  Moreover, as a factual matter,

not everyone who is physically able to work part time will be physically able to work full time.

If working causes pain or fatigue that increases with time, the pain or fatigue might be tolerable

at the start of a day (or week) and then gradually become intolerable over time.

Dickerman, in concluding that Huberty was not disabled, expressly relied on his

understanding that Huberty was working close to eighty percent of the time and was sometimes

working a full eight-hour day.  *See, e.g.*, AR-460 to -461.  When Standard later told Dickerman

that it had misinformed him — and that Huberty had probably never worked an eight-hour day

and that his hours had peaked at twenty-eight to thirty hours a week for a few months and then

declined — Dickerman stuck to his earlier opinion.[59]  AR-738.  Because Dickerman relied

---

[59]The Court has its doubts about whether Dickerman sincerely relied on Huberty's hours
in assessing his disability.  Given Dickerman's dismissiveness with respect to Huberty's
"subjective pain symptoms," it is possible that Dickerman, because he believed that Huberty had
no neurological disease, may have believed categorically that Huberty could not have been

excessively on Huberty's part-time work schedule to find him capable of full-time work, Standard abused its discretion in finding that Huberty's symptoms were not in fact disabling based on Dickerman's opinions.

A similar problem undermines Hosack's opinion that Huberty's medications were not disabling. Hosack remarked glibly that Huberty was not disabled by the many medications he was taking because they could be adjusted by his doctor, the side effects would disappear, and therefore they were not disabling "especially since [the side effects] do[] not prevent part time work." AR-507.

As a general principle, doctors obviously try to manage their patients' medications to minimize their side effects. But doctors may have more or less success in doing so. By the time Hosack gave her opinion, Huberty's doctors had been trying to manage his medications for many months, and Huberty still reported that they hurt his ability to function. Hosack never talked to Huberty or any of his doctors. Thus, she had only two pieces of evidence as to the medications' effects on Huberty in particular (as opposed to their side effects on patients in general): Huberty's report and the fact that Huberty was working part time. Huberty reported that he was impaired by the medications, so Hosack cannot have relied on that evidence for her conclusion that he was not disabled. And by concluding that because Huberty was working part time, he could work full time, Hosack acted inconsistently with the policy's coverage of partial disability.

In short, Standard's only evidence that Huberty's symptoms and medications were not disabling was the fact that Huberty worked part time. By concluding from Huberty's part-time work that he was capable of full-time work — and by doing so in the face of evidence that

disabled.

Huberty was receiving medical care for symptoms that numerous medical providers took seriously and tried to treat — Standard abused its discretion.

### c.  Entitlement to Benefits

For the reasons given above, Standard abused its discretion in terminating Huberty's benefits in September 2000.  The administrative record establishes that Huberty was disabled (i.e., unable to earn eighty percent of his pre-disability earnings) through January 16, 2002, at which point Hartleben cleared Huberty to work four to eight hours per day doing light-duty work.  AR-1097.  Accordingly, Huberty is entitled to long-term disability benefits for the period from September 20, 2000 through January 15, 2002.

### 2.  Claim 2:  November 2003 Benefits Denial.

Standard discontinued Huberty's short-term disability benefits as of November 30, 2003, a couple of weeks shy of the policy's maximum-benefit period.  Because Huberty did not receive maximum short-term disability benefits, Standard never considered whether he was entitled to long-term benefits.[60]  Thus, the only claim before the Court is Huberty's claim for short-term benefits from December 1 through December 14, 2003.

The Court agrees with Huberty that Standard abused its discretion in discontinuing his short-term benefits because, in doing so, Standard relied on the opinions of physicians who

---

[60]The long-term disability policy in effect in 2003 is not in the record.  But if the policies in effect in 2003 were the same as the short-term and long-term policies in the record, there is reason to doubt that long-term coverage depends on receiving maximum short-term benefits, for two reasons.  First, the two policies have significantly different proof-of-loss provisions.  The short-term policy's proof-of-loss provision is much more restrictive than the corresponding provision in the long-term policy, and thus proof of loss that would not be satisfactory under the short-term policy could be satisfactory under the long-term policy.  Second, nothing in the long-term policy refers to coverage under the short-term policy as a precondition to long-term coverage.  (It also appears that the policies can be purchased separately.)

disregarded evidence that Huberty was disabled by a mental disorder.  The Court does, however, find that Standard did *not* abuse its discretion in discontinuing Huberty's benefits to the extent that Huberty's claim was based on a disability caused by a physical disease.  The court also finds that Standard must determine in the first instance whether Huberty was eligible for long-term disability benefits after December 14, 2003.  The Court therefore discusses Huberty's claim for long-term benefits only briefly.

### a. Short-Term Disability Benefits

Standard contends that it was entitled to cut off Huberty's short-term disability benefits as of November 30, 2003 for two reasons.  First, Standard argues that Huberty's claim fails because it was based on purely subjective complaints and not a documented physical disease.  Def. SJ Mem. at 29.  Second, Standard argues that to the extent that Huberty's claim was based on a mental disorder or cognitive difficulties, Standard properly found that insufficient evidence supported his claim.  *Id.* at 30.

### i. Physical Disease

Standard relied on the opinions of Dickerman (who again reviewed Huberty's records) and Matz (who conducted an IME in March 2004) to conclude that Huberty had not established that he was disabled by a physical disease.  Both doctors agreed that Huberty had not provided objective evidence that his symptoms arose from a neurological disorder.

By September 2003, even Huberty's own physicians had concluded that his symptoms were not neurological.  Huberty's neurologist at the time, Ormiston, speculated that Huberty's condition might be "musculoskeletal."  AR-1005.  But there was no objective evidence of any untreated musculoskeletal pathology that would have explained Huberty's symptoms.  Hartleben had hypothesized in 2000 and 2001 that Huberty's pain was "mechanical neck pain" that could

be relieved by cervical fusion surgery, but in August 2003 Hartleben said that nothing further could be done surgically for Huberty's condition.  AR-1126.

Under the short-term disability policy's proof-of-loss provision, the lack of evidence demonstrating any underlying physical disease that could account for Huberty's pain symptoms entitled Standard to discontinue Huberty's benefits.  For claims based on physical disease, the short-term-disability policy's proof-of-loss provision requires "proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  AR-762.

From 1999 through 2001 Huberty's doctors thought that a physical pathology of one type or another explained his symptoms.  But by the time Standard closed Huberty's short-term benefits claim in November 2003, it was clear that his doctors could identify no specific pathology that would explain his condition.  Although Huberty's primary-care physician and pain-clinic doctors continued to indicate that he suffered from cervical myelopathy, neuropathy, and degenerative disk disease, the specialists who treated Huberty for those conditions (Kennedy, Hyser, Ormiston, and Hartleben) did not believe, by late 2003, that the conditions explained Huberty's symptoms or were, by themselves, disabling.

Neither Dickerman nor Matz considered whether Huberty's constellation of symptoms and disorders was disabling.  Indeed, Matz said that sleep apnea and obesity were not a significant part of Huberty's claimed disability.  AR-1422.  As to sleep apnea — a physical disease that Huberty demonstrably suffered — Matz was plainly mistaken.  But Huberty did not claim that sleep apnea alone was disabling; rather, his claim was that his pain symptoms, drowsiness (a consequence of both sleep apnea and restless-leg syndrome), and depression,

along with the side effects of his medication, combined to disable him.[61]  *See* AR-825 to -826; AR-951 to -952.  Accordingly, because Huberty's claim rested in part on subjective symptoms (pain) without evidence of an underlying physical illness, and in part on a mental disorder (depression), as well as on the cognitive effects (drowsiness) of a physical condition (sleep apnea), Standard did not abuse its discretion in finding that Huberty had not provided sufficient documentation of a physical disability.

The Court emphasizes, however, that this conclusion turns on the restrictiveness of the proof-of-loss provision in the *short*-term disability policy — a restrictiveness that is not shared by the proof-of-loss provisions in the *long*-term disability policy discussed in connection with Claim 1.  Both Matz and Dennison disagreed with Huberty's doctors as to the etiology of Huberty's complaints.  For reasons discussed above in connection with Huberty's first claim, this disagreement about etiology would not necessarily support the conclusion that Huberty was not disabled by a physical disease, given the extensive clinical evidence that Huberty subjectively experienced severe and chronic pain.  And Matz's and Dennison's opinions certainly would not foreclose the possibility that Huberty was disabled by psychogenic pain — that is, by a mental disorder.

The Court also points out that Matz's opinion is suspect because of Matz's utter indifference to (even disdain for) Huberty's subjective complaints.  Indeed, it appears that

---

[61]On his claim form, Huberty wrote that he "cannot concentrate, fall asleep, in constant pain . . . ."  AR-826.  Dennison wrote on his portion of the form that Huberty suffered pain, depression, and diminished alertness and concentration.  AR-825.  In a follow-up letter, Dennison said that Huberty was disabled by "the combination of chronic pain, excessive daytime sleepiness and [Huberty's] ability to concentrate because of his chronic medications."  AR-951.

Standard may have deliberately sought out Matz because they expected him to agree that Huberty was not disabled, rather than because they wanted a truly independent opinion.

The Court was struck by the fact that Standard told Huberty that it was "having trouble finding a qualified doctor" to do an IME in the Minneapolis-St. Paul area. AR-1152. The University of Minnesota is a major research institution associated with a large academic hospital, and the nearby Mayo Clinic in Rochester, Minnesota is a world-renowned medical center. Why would Standard need to send Huberty all the way to Chicago for an IME? Perhaps because Matz has publicly expressed skepticism of disability claims just like Huberty's. *See* Marshall Matz, *Commentary — Injury, Pseudoinjury, and Litigation*, 60 Surgical Neurology 479-80 (Dec. 2003). This may make Matz a desirable expert witness in defending a lawsuit over a disability claim, but it casts some doubt on whether an insurer, which has a fiduciary duty toward its beneficiaries, should hire Matz to conduct an IME.

That said, Matz's assessment of the objective evidence in Huberty's medical records (as opposed to Matz's assessment of Huberty's subjective symptoms) is consistent with Dickerman's assessment and with the records themselves. Accordingly, Standard acted within its discretion in finding that the medical records provided insufficient evidence of "anatomical or physiological abnormalities" that caused Huberty's symptoms — evidence that is required by the short-term policy's proof-of-loss provision.

### ii. Mental Disability

Huberty's 2003 claim had both physical and mental components, in that Huberty claimed to be disabled by the combined effect of pain, depression, sleep apnea, and medication. Huberty correctly points out that Standard never considered these combined effects. Pl. SJ Mem. at 18.

In particular, Standard ignored the effect of Huberty's chronic pain on his ability to do his cognitively demanding job with "reasonable continuity."[62]

As noted above, Huberty's pain symptoms, alone, were not enough to support a claim for disability based on physical illness, because Huberty did not provide sufficient evidence of a physical etiology for those symptoms.  But this did not license Standard to ignore Huberty's pain entirely, given the overwhelming evidence that it was not feigned.[63]

None of the reviewing doctors who considered Huberty's claim of cognitive impairment considered the effect of his pain.  Further, some of these doctors drew conclusions about the degree of Huberty's impairment that were plainly unsupported by the evidence.  For both of these reasons, Standard abused its discretion in denying Huberty's claim for benefits based on the opinions of its reviewing physicians about whether Huberty was disabled by a mental disorder.

Gwinnell, the first doctor to consider whether Huberty was disabled by a mental disorder, considered only the records from Huberty's treatment with Vine for depression from July to October 2003.  Gwinnell noted that Huberty complained to Vine of pain and had a history of sleep apnea but she did not review records related to those conditions.  Gwinnell concluded that

---

[62]As discussed above, the short-term disability policy defines an employee as disabled if the employee is "unable to perform with reasonable continuity the Material Duties of [his] Own Occupation; and . . . [the employee] suffer[s] a loss of at least 20% in [his] Predisability Earnings when working in [his] Own Occupation."  AR-769.  As used in the short-term disability policy, the phrase "with reasonable continuity" means something like "on a full-time or close to full-time basis."

[63]As noted above, Selmo diagnosed Huberty as having at least partly psychogenic pain. AR-635.  But pain is experienced subjectively, regardless of its source.  So even if Huberty's pain was psychogenic, this was not a reason to disregard the effects of his experience of that pain.

the records of Huberty's treatment with Vine "[did] not support limitations and restrictions from

a psychiatric perspective." AR-1020.  Specifically, Gwinnell said that the records illustrated "a

depression which is perhaps significant, but not to the point of prevent[ing] Mr. Huberty from

functioning in some occupation for which he is physically capable." AR-1021.

As an assessment of whether  Huberty was disabled in November 2003, Gwinnell's

opinion is deeply flawed.  First, Gwinnell's assessment was limited to determining the disabling

effects of Huberty's depression, not of his depression *in combination with* pain, sleep apnea, and

the side effects of medication.  Further, Gwinnell concluded that because Huberty's mental-

status exams were normal at a particular point in time — during a doctor's appointment — he

was capable of doing his job with reasonable continuity.  But the conclusion does not follow

from the premise.

Suppose that Huberty had two or three "good" hours at the start of each day, but was then

overcome by pain and fatigue by midday (not an implausible hypothesis).  During those two to

three hours, Huberty's mental-status exam would be normal; this would not mean that he could

do his job with "reasonable continuity."  Indeed, Gwinnell did not even consider whether

Huberty could do his job with reasonable continuity.  Rather, she opined that he could

"function[] in some occupation for which he is physically capable." AR-1021.

The review by Green, an internal-medicine doctor, was equally flawed.  Although Green

(unlike Gwinnell) reviewed all of Huberty's medical records, she did not consider the effect of

Huberty's pain.  Instead, she cited Hartleben's statement that, from his perspective, Huberty

could do sedentary and light work. AR-1485.  Green did not, however, cite Hartleben's further

comment that he could not offer an opinion as to whether Huberty's symptoms, in combination,

were disabling. *See id.*  Further, Green discounted Huberty's reports of his symptoms on the

basis that there was "no objective change" in Huberty's physical condition from the period when he was working to the date he claimed to be disabled. *Id.* This is a reason to find that Huberty was not physically disabled; it is not a reason to find that he was not mentally disabled by his (possibly psychogenic) pain.

As to Huberty's depression, Green simply affirmed Gwinnell's flawed opinion that the depression was not, in itself, disabling. *Id.* Green also said that there was no documentation that Huberty had "significant side-effects" from any of his medications, and that there was no evidence that Huberty's "sleep apnea, or questionable daytime hypersomnolence, is of a severity to preclude a sedentary occupation." *Id.* But Green's opinion related to each of these conditions individually. She asserted, as to each one, that it was not sufficiently severe to disable Huberty. Green never considered whether the *combination* of these conditions was disabling.

Further, Green's conclusions about the severity of the side effects of Huberty's medication and of his sleep apnea are puzzling and are contrary to the record. The medical records show that Huberty's medications were frequently adjusted and that he regularly complained of their side effects. Further, Dennison believed that Huberty's medication was hurting his ability to concentrate and focus. AR-951. Given that the side effects of which Huberty complained are necessarily subjective, what other evidence could Huberty have provided except his self-assessments and his doctor's clinical observations?

And what could Green have meant by saying that Huberty's sleep apnea was not severe and calling his daytime hypersomnolence "questionable"? AR-1485. The sleep clinic that evaluated Huberty said that his "sleep disordered breathing was severe." AR-1180. Huberty was prescribed a CPAP mask for apnea and Mirapex for restless-leg syndrome, as well as Ritalin for daytime sleepiness. Huberty reported that he had difficulty sleeping at night, and difficulty

staying awake during the day as a result. *See* AR-951. What other evidence could Huberty have provided of the severity of his symptoms? Both Huberty's primary-care doctor and his neurologist thought that his symptoms, in combination, were disabling. AR-950 to -951; AR-1004. Because Green did not even consider the combined effects of his symptoms, let alone whether Huberty could do his own occupation with "reasonable continuity," Green's opinion did not provide a basis for discontinuing Huberty's benefits.

The opinion of the third reviewing doctor, Grant, was no better than the opinions of Gwinnell and Green. Grant, a psychiatrist, said that the medical evidence indicated that Huberty had no cognitive problems. AR-1597. This is true only if one ignores Dennison's assessment that Huberty's alertness and concentration were diminished because of his constellation of symptoms. *See* AR-825; AR-951. And Grant's reliance on the results of mental-status exams is flawed for the reasons given above: Just because Huberty was able to function during a doctor's visit does not mean that he could maintain that level of functioning sufficiently to do his job with "reasonable continuity."

In addition, Grant, like the other reviewing doctors, did not consider whether Huberty's subjective experience of pain interfered with his ability to do his job with reasonable continuity. Grant ignored this question notwithstanding evidence that all of the doctors who treated Huberty around the time he filed his disability claim believed that he suffered significant pain. Ormiston remarked, describing Huberty's appearance at a September 4, 2003 visit, "The way [Huberty] looks it doesn't look as if he could manage at work." AR-1004. Ormiston identified "a lot of palpable tenderness" during a September 30, 2003 exam. AR-1005. Dennison found Huberty's neck to be tender on physical exam on multiple occasions. *See, e.g.*, AR-908 to -909. Espeland,

a pain-clinic doctor, found Huberty to have neck pain on physical exam on November 30, 2003. AR-1213.  And Huberty was seen more or less continually for treatment by pain specialists.

Finally, Grant misstated Huberty's history and overemphasized his past ability to work, while discounting evidence from Dennison that Huberty's condition in September 2003 onward was worse than his condition in the past.  Grant said that since 1999, Huberty had experienced depression and physical complaints similar to his complaints in 2003, but "[t]hroughout that time, he has been able to function and to perform at his work related tasks."  AR-1555.  In fact, Huberty was on disability for a big chunk of that time, and he underwent two back surgeries and one hand surgery in an attempt to relieve his symptoms.  Also over that time, the intensity of his symptoms waxed and waned.  Further, Huberty was not diagnosed with a sleep disorder until 2003.

In short, no one working for Standard considered whether the combined effects of Huberty's different maladies disabled him.  The doctors who disregarded his pain (Dennison and Matz) did not consider its cognitive effects because they did not believe that Huberty had sufficiently demonstrated the pain's physiological basis.  And the doctors who considered the cognitive effects of Huberty's depression and sleep apnea did not consider the effects of his pain, did not consider whether he could sustain adequate cognitive functioning over the period required to do his job with "reasonable continuity," and drew conclusions about the severity of Huberty's symptoms that were not warranted by the evidence.

The evidence established that Huberty's pain was not feigned, that his sleep disorder was severe, and that his depression was significant.  Dennison and Ormiston opined that he was disabled based on all of these conditions together.  AR-825; AR-951; AR-1004.  Ormiston

suggested that if this was in doubt, a functional-capacity evaluation would be warranted.  AR-1004.

Standard did not request a functional-capacity evaluation.  Instead, Standard decided that Huberty's subjective symptoms were not disabling without any basis for that opinion, and without communicating with Huberty's physicians.  Standard chose to pick apart Huberty's disability and to disregard a key component (pain) because it was subjective.  This was an abuse of discretion, and Huberty is therefore entitled to the balance of his short-term disability benefits.

### b. Long-Term Disability Benefits

As noted above, the long-term disability policy in effect in 2003 is not in the record.  Further, Standard never considered whether Huberty was eligible for benefits under that policy.  Finally, there is not much medical evidence in the record from after November 2003.  The Court therefore cannot consider whether Huberty was entitled to long-term benefits after December 14, 2003.

The court will, however, direct Standard to consider, in light of this opinion, Huberty's eligibility for those benefits under whatever policy was in effect at that time.  The Court cautions Standard that Huberty's pain symptoms, even if psychogenic, must be considered unless Standard can establish that the symptoms are feigned.  If Huberty disagrees with Standard's decision, then he may, of course, file a lawsuit challenging that decision.

### ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Standard's motion for summary judgment [Docket No. 22] is DENIED.

2.      Huberty's motion for summary judgment [Docket No. 28] is GRANTED IN PART as follows:

      a.      The Court DECLARES that Huberty was entitled to long-term disability benefits under the long-term disability insurance policy in the record for the period from September 20, 2000 through January 15, 2002.

      b.      Standard is ORDERED to pay benefits to Huberty in accordance with the terms of the long-term disability policy in the record for the period from September 20, 2000 through January 15, 2002.

      c.      The Court DECLARES that Huberty was entitled to short-term disability benefits under the short-term disability insurance policy in the record for the period from December 1, 2003 through December 14, 2003.

      d.      Standard is ORDERED to pay benefits to Huberty in accordance with the terms of the short-term disability insurance policy in the record for the period from December 1, 2003 through December 14, 2003.

      e.      Standard is ORDERED to consider Huberty's claim for long-term disability benefits from December 15, 2003 forward in accordance with this order and with the terms of whatever long-term disability insurance policy was in effect at that time.

3.      Huberty's motion for summary judgment is DENIED in all other respects.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March <u>25</u>, 2008                    <u>s/Patrick J. Schiltz</u>
                                       Patrick J. Schiltz
                                       United States District Judge